[No. 31448. Department Two. March 15, 1951.]

ROBERT EDWARD JOHNSON, *Appellant*, v. BUSINESS MEN'S ASSURANCE COMPANY OF AMERICA, *Respondent*.[1]

*Ward & Barclay*, for appellant.

*Welts & Welts*, for respondent.

HAMLEY, J.—Carl J. Johnson collapsed and died shortly after emerging from his burning home, which he had re-

[1] Reported in 228 P. (2d) 760.

entered for the purpose of removing furniture and belongings. His son, Robert Edward Johnson, as beneficiary of an accident insurance policy, brought this action to recover two thousand dollars under the death indemnity provision. The policy insured Johnson

" . . . against loss resulting directly and independently of all other causes from bodily injuries . . . effected solely through accidental means . . ."

Defendant insurance company denied liability on the ground that death did not result from causes covered by the above policy provision. The primary question posed by the pleadings, therefore, was whether Johnson's death was effected through accidental means. The action was tried to a jury.

The evidence, when viewed in a light most favorable to plaintiff, discloses the following facts: On August 2, 1948, Johnson was a man fifty-eight years of age, in vigorous health, and accustomed to heavy physical exertion in his work and diversions. He lived with his wife, Mrs. May Johnson, and her son-in-law, George Dow, in the family home at Bay View, Skagit county, Washington. He came home from work about five o'clock p. m. on that day. A few minutes before six o'clock he sat down to dinner with his wife and Dow. About twenty-five or thirty minutes later, while they were still at the dinner table, Mrs. Johnson remarked that she heard a noise upstairs. Dow and Johnson left the table immediately and went upstairs, Dow in the lead. When Dow reached the head of the stairs he discovered that smoke and flame had engulfed the whole upstairs. He shouted, "The house is on fire!" and stayed at the head of the stairs for a few seconds, tossing down clothing and other articles within easy reach.

When Johnson heard that the house was on fire, he immediately turned and went back downstairs. There was no local fire department, and Johnson apparently realized that there was no chance of saving the house. He and a next-door neighbor, Tom Look, began moving articles out of the kitchen, including a heavy refrigerator. There was

little, if any, smoke in the kitchen at this time. They made from six to eight trips back into the kitchen, which was located on the north side of the house. There was apparently nothing wrong with Johnson while they were working in the kitchen.

He and Look then went to the south side of the house and entered a utility door which led to a bedroom. Here they removed a dresser and other articles of bedroom furniture, bedding, and clothes. Johnson made from four to six trips into the house through the south door. Johnson had been working fast, and seemed to be tired when he started working at the south side of the house. There were several men then working at the south side of the house. Johnson and the other workers coughed some, due to the increasing density of the smoke.

The fire was directly over the south bedroom when Johnson and the others began carrying things from that room. However, flame had not yet broken into the room, and there was no great amount of smoke. The smoke then began entering the room and became progressively worse as Johnson and the others made trips back into the bedroom. The workers knew the smoke was rolling in, and it finally became so bad that they could not open their eyes as they groped around for articles to remove. Heat also began entering the room as the work continued.

After making several trips into the south bedroom, Johnson apparently interrupted his work in this part of the house and went around to the east side, where Dow was removing possessions from an attached woodshed. At this time the ceiling and walls of the woodshed were in flames and the smoke was very thick. Johnson helped remove a dresser from a point near the door of the woodshed. Dow described Johnson's condition at this time as follows:

"Q. What was Carl's condition at that time? A. Well, he was what I would call just like an ordinary person would be with a fire. He was excited and he seemed very much exhausted. He had been working hard and he seemed— well, just not exactly like himself. He was worked up and had been working hard — well, exhausted and just upset."

Johnson then returned to the south side of the house. He remarked to one of the others that "it isn't too bad in the bedroom," and then re-entered the house through the south door. Raymond Nelson and Grover Walker followed Johnson into the house on this last trip, but did not go as far into the bedroom as Johnson did. The smoke was then rolling so thick in the house that it was impossible to see. The whole house was ablaze, and the walls and roof were beginning to come down. Johnson groped around in a closet and then emerged, carrying an article, followed by Nelson and Walker carrying a chiffonnier.

Johnson turned around, apparently intending to go back into the house. Walker and Jack Whalen grabbed Johnson, however, and would not permit him to re-enter the building. The three men were then standing only ten or fifteen feet from the building, and it was so hot they had to move back. The other two men assisted Johnson, as his legs seemed to give way. At this time Johnson was apparently tired and excited, his eyes were red from smoke, and he was black and dirty with soot. All of the men were coughing because of the smoke. The roof then caved in, and along the edge of the roof the outside boards were starting to fall off. The ceiling of the south bedroom was also coming down, the heat had become intense, and the house seemed ready to explode. All of the witnesses agreed that it would then have been impossible to go back into the house.

While Johnson and the others stood some forty or fifty feet from the burning house, Johnson told how the fire had started. He then remarked, "If it wasn't for the smoke I could take it," and immediately collapsed onto the ground. He was not gagging, choking, or having a long, continuous coughing spell at this time, but had been coughing some, as had the others present. Dr. John W. Wallin was immediately summoned, and, upon his arrival a few minutes later, Johnson was pronounced dead. It was estimated that approximately thirty minutes had elapsed between the discovery of the fire and Johnson's collapse, which had occurred about five minutes after Johnson last emerged from the house.

The jury returned a verdict for plaintiff, but the trial court entered judgment for defendant notwithstanding the verdict. Plaintiff has appealed, assigning as the only error the granting of the judgment n. o. v.

■ The rule is now firmly established in this state that, in order to recover under a policy insuring against death or injury by accidental means, (1) it is not enough that the *result* was unusual, unexpected or unforeseen, but it must appear that the *means* were accidental; and (2) accident is never present when a deliberate act is performed, unless some additional, unexpected, independent, and unforeseen happening occurs which produces or brings about the result of injury or death. *Evans v. Metropolitan Life Ins. Co.*, 26 Wn. (2d) 594, 174 P. (2d) 961; *McMahan v. Mutual Benefit Health & Accident Ass'n*, 33 Wn. (2d) 415, 206 P. (2d) 292.

Applying that rule to the instant case, the primary question presented is whether there was substantial evidence from which the jury could have found that Johnson's death was produced or brought about by an unexpected and unforeseen happening additional to and independent of Johnson's deliberate acts in connection with saving his household goods during the fire.

Appellant does not appear to contend that there was any unexpected and unforeseen happening of this kind prior to Johnson's last entry into the house. Nor would the record support such a contention, since there is no evidence whatever of any such incident up to that time. Johnson was working rapidly in various parts of the house, and was evidently becoming more excited and exhausted as time went on. The progress of the fire, however, was readily observable, and there is nothing to indicate that, prior to his last trip into the house, Johnson was confronted with any hazard or danger in the way of smoke, flame, heat, or other factor which he did not foresee or anticipate.

It is argued, however, that there was evidence sufficient to go to the jury that Johnson came into contact with an unexpected lethal concentration of smoke and shortage of oxygen on his last trip into the house, and that this was

additional to and independent of Johnson's deliberate act of re-entering the house. In this connection, appellant calls attention to *McCarron v. John Hancock Mut. Life Ins. Co.*, 156 Pa. Super. 287, 40 A. (2d) 118, where recovery under an accident insurance policy was permitted upon a showing that the insured was suddenly exposed to a deadly concentration of formaldehyde fumes upon opening an enclosure around a paper-coating machine for the purpose of making repairs. Appellant also relies upon *Dalbey v. Equitable Life Assurance Soc.*, 105 Mont. 587, 74 P. (2d) 432, where recovery was permitted on a similar policy upon a showing that a fireman had been confronted with an unusual concentration of smoke and gas as he climbed to the top of a six-foot fence.

Respondent resists this argument on several grounds, one being that there was no proof that Johnson's death resulted from coming into contact with smoke and lack of oxygen during his last trip. This calls for an examination of the evidence as to the cause of death.

Medical testimony as to the cause of death was received from two doctors who were called by appellant. Neither had treated Johnson in his lifetime, and there was no *post mortem* to aid in the formulation of their professional opinions. Dr. Wallin was asked this hypothetical question:

"Doctor, assuming that Carl Johnson, a man 58 years and 8 months of age, apparently in good health on and some years prior to August 2, 1948, and on that day his house caught fire while he was eating supper; that for from twenty-five to thirty minutes he worked strenuously in removing furniture from his house under conditions of intense heat and smoke; that after he made the last trip he talked to some friends for about five minutes, telling them how the fire started, when he said 'If it wasn't for the smoke I could stand it,' immediately collapsed and died; and from what you observed at the time you examined him, can you give us your opinion as to the cause of his death?"

Dr. Wallin answered:

"Well, it is my opinion that the man probably died from the combination effects of the effect of smoke on his lungs, exhaustion and probably an underlying hysteria."

Upon cross-examination, Dr. Wallin was asked to further explain his opinion with respect to two of these factors: the effect of smoke on Johnson's lungs, and exhaustion. As to the effect of smoke, Dr. Wallin testified:

"Q. Now if a person died from his exposure to smoke and that alone, he simply suffocates; doesn't he? A. No. Q. His heart stops beating? A. That is not it. Q. He can't get enough air? A. Pardon me? Q. He can't get enough oxygen? A. That is right. Q. And chokes from it? A. Well, yes. Q. And there is air hunger present; isn't there? A. No. Q. There isn't. Then, if not, that condition has to be in existence for a long period of time for death to occur, doesn't it? A. Death due to smoke may also be due to what we call 'pulmonary edema.' Q. All right, let us check about pulmonary edema. Did this man have pulmonary edema? Do you know if he had pulmonary edema? A. No. Q. You could not tell that without a post-mortem? A. No. Q. And there was none to your knowledge? A. No. Q. So when we are talking about death from the smoke cause we are assuming that he had pulmonary edema, are we not; we have to get to that conclusion, do we not? A. Right."

With regard to the factor of exhaustion, Dr. Wallin stated that exhaustion itself may cause death. He defined exhaustion as "a complete depletion of all our reserves, both mental and physical, due to work." He repeated the opinion, expressed in the answer to the hypothetical question, that exhaustion was a factor in Johnson's death. However, he further testified on cross-examination as follows:

"Q. Doctor, is it not a fact that in the absence of a prior history of this man or a post-mortem examination, or both, that you or any doctor cannot swear definitely that he knows what caused this man's death; isn't that true? A. Yes. Q. We know his heart stopped beating, and whenever death occurs a man's heart does stop beating? A. Yes. Q. There were very many things that might or could cause the result of the heart stopping to beat; obviously; right? A. Right."

The other medical expert, Dr. Robert Hunter, was asked the same hypothetical question which had been asked of Dr. Wallin, except that there was omitted any reference to an examination of Johnson. Dr. Hunter answered this question

by expressing the view that Johnson had died of "cardio-respiratory" failure.

Explaining what he meant by this term, Dr. Hunter indicated that inhalation of an excessive amount of smoke could result in death because of its effect upon either the lungs or heart, or both. With respect to the lungs, pulmonary edema can occur. This is detrimental in two respects: It causes body fluids to occupy space in the lungs intended for air; and it causes a great deal of coughing. With respect to the heart, the demands of the body for more oxygen, brought on by the inhalation of smoke instead of oxygen, can cause uncontrolled beating of the heart, called "fibrillation," which results in immediate death. Such a strain on the heart may also cause the heart to dilate, so that the valves of the heart can no longer function.

Dr. Hunter also testified that stress and excitement may also result in the release of an excess amount of adrenalin, which may stimulate the heart beyond its capacity. This stimulation itself may cause fibrillation or dilation of the heart.

On cross-examination, Dr. Hunter expressed the view that adrenalin was released in Johnson's body due to the excitement under which he was laboring, but the amount of adrenalin would depend upon the nature of the excitement. His testimony on this was as follows:

"Q. Now, you don't know whether adrenalin was released by Nature in this man, or not; do you? A. No. Q. (Continuing) In a quantity sufficient to be damaging to the heart, I mean; you have no way of knowing that, have you? A. On the basis of my knowledge and experience, I believe I can definitely say it was released; yes. Q. Do you know how much or in what quantities? A. No. Q. You are assuming there was some excitement. It would depend on the nature of the excitement as to the quantity of adrenalin released? A. Yes. Q. And that, of course, you have no way of knowing, except by assumption; isn't that true? A. That is right. Q. So that to the other things that you have spoken of which through your studies could cause death, you have had to assume that there was sufficient of those factors developed and present in this man in order to base your ultimate con-

clusion upon that those things caused this man's death; you have to assume that, don't you? A. Yes."

Dr. Hunter stated that, in determining whether smoke and heat was a factor in determining death, "it is all-important that he was exposed, not the time he was exposed." He also made it clear that he was expressing a view only as to what could have caused death in view of the factors mentioned in the hypothetical question. The questions and answers relative to this point are as follows:

"Q. Actually, you cannot tell, Doctor, and do not know really what caused the man's death. A. Yes, I do know. I do know; yes. Q. Well, his heart stopped beating; sure, I know that and so do we all know his heart stopped beating. But you cannot tell with scientific certainty what caused his heart to stop beating, can you? A. I don't believe that I said I did. Q. We do know and have assumed certain factors which, at present, might produce stimulus. Now, you have spoken about three things that might be produced. Well, you don't know which, if any, of those three things were produced in this instance; do you? A. I believe I said any or all of them. Q. Could have been? A. Yes, could have been; I was asked a hypothetical question. Q. It is possible one of those things might have been created under a hypothetical situation submitted and the assumption you gave under your testimony; is that right? A. Yes."

In our view, the evidence reviewed above provides no basis upon which the jury could have found that death was due to anything which occurred solely as a result of Johnson's last trip into the house.

The doctors were not asked a hypothetical question based upon an experience of that kind, and expressed no view concerning it. The hypothetical question asked of each doctor was based upon the entire house-burning incident, from the time the fire was discovered while Johnson was eating supper until he collapsed twenty-five or thirty minutes later. They were asked specifically to base their opinions upon the hypothesis that Johnson "worked strenuously in removing furniture from his house under conditions of intense heat and smoke" for from twenty-five to thirty minutes. These hypothetical questions were very ap-

parently based upon, and intended to develop proof in support of, the broad allegations of the complaint as to the cause of death. It is there alleged that the insured's death ". . . resulted from the inhaling of smoke and gas from the said fire, and as a result of shock and exhaustion due to over-exertion during the burning of the said dwelling house."

It is also to be observed that neither doctor, in answer to the broad hypothetical question, undertook to say that death resulted from purely accidental means, such as inhaling of smoke, encountering heat, or suffering any other injury directly caused by the fire, *and independent of all nonaccidental causes,* whether or not occurring during the last trip into the house.

Dr. Wallin expressed the view that Johnson's death probably resulted from the combination of three factors: effect of the smoke on Johnson's lungs, exhaustion, and probably underlying hysteria. Dr. Wallin stated definitely that whether smoke had caused death, through the bringing about of pulmonary edema, could not be determined without a *post mortem.* He defined the second factor, "exhaustion," as being a depletion of mental and physical reserve "due to work." This "work," of course, related to Johnson's entire activity during the fire, since he did a comparatively small amount of work on his last trip into the house. Likewise, the factor of hysteria relates to the entire house-burning incident, there being no evidence that his excited condition was due solely, or even primarily, to conditions encountered on his last trip into the house.

Dr. Hunter expressed the opinion that death resulted from cardio-respiratory failure, which he defined to include a number of possible causes of death, some of which were related to the inhalation of smoke and some of which were not. He testified, for example, that death may have resulted from the release of an excess amount of adrenalin in Johnson's body "under the stimulus of excitement." Again, there was no attempt to limit this "excitement" to Johnson's final experience in entering the burning house. The uncontradicted testimony shows, in fact, that Johnson became

more excited as the fire progressed. Dow testified that before Johnson returned to the south side of the house for his last trip into the bedroom, he was excited and seemed very much exhausted and upset, and was "not exactly like himself."

It is therefore our opinion that the evidence provides no basis for a jury finding that death was caused by inhalation of smoke, or other deleterious effects of the fire, unrelated to Johnson's excitement and exhaustion due to his own activity and the whole tragic experience of witnessing the destruction of his home. It is to be remembered that the policy insures only against loss effected solely through accidental means "resulting directly and independently of all other causes."

It is the settled rule that death due to dilation of the heart, coronary occlusion or thrombosis, or other circulatory failure resulting from mere overexertion, independent of a slip, fall, or other unforeseen occurrence, does not give rise to liability under an accident insurance policy of this kind. *Hodges v. Mutual Benefit Health & Accident Ass'n,* 15 Wn. (2d) 699, 131 P. (2d) 937; *Crowell v. Sunset Cas. Co.,* 21 Wn. (2d) 238, 150 P. (2d) 728; *New Amsterdam Cas. Co. v. Johnson,* 91 Ohio St. 155, 110 N. E. 475; *Rock v. Travelers' Ins. Co.,* 172 Cal. 462, 156 Pac. 1029; *Schmid v. Indiana Travelers' Accident Ass'n,* 42 Ind. App. 483, 85 N. E. 1032; *Herthel v. Time Ins. Co.,* 221 Wis. 208, 265 N. W. 575.

But, even if it be assumed that death was caused by inhalation of smoke, there was not, as heretofore indicated, any proof that the inhalation of a fatal amount occurred during Johnson's last entry into the house, as distinguished from the amount inhaled during the entire twenty-five or thirty minutes. There was thus a lack of proof that death was due to *suddenly* encountering an *unanticipated* concentration of smoke, and was therefore the result of an unexpected and unforeseen happening additional to and independent of Johnson's activity in saving his belongings from the burning home.

Many cases are cited in the exceptionally well-prepared briefs. Most of them, however, bear upon the question of

what constitutes an additional, unexpected, independent, and unforeseen happening, sufficient to give rise to liability under an accident policy where there has been a deliberate act by the insured, such as Johnson's acts in several times re-entering his burning home. None of the cited cases are of assistance in determining the factual question here considered of whether such a happening, assuming it to have occurred, brought about the injury or death upon which the cause of action is predicated.

We conclude that there was no substantial evidence tending to support appellant's case on this essential point, and that the judgment for respondent n. o. v. was therefore proper.

The judgment is affirmed.

SCHWELLENBACH, C. J., ROBINSON, MALLERY, and GRADY, JJ., concur.