ALLSTATE INSURANCE COMPANY, an Illinois corporation, Plaintiff,

v.

Brenda PATTERSON, individually and as natural mother and general guardian of Jens Martin Dietz, Jr., a minor, and Tadd Dietz, a minor; Jens Martin Dietz, Jr.; Tadd Dietz; Clifford Forney; Leila Forney; Beverlee McLaughlin; Richard Forney; Robert Forney; and Ray McLaughlin, Defendants.

Brenda PATTERSON, individually and as natural mother and general guardian of Jens Martin Dietz, Jr., a minor, and Tadd Dietz, a minor, Jens Martin Dietz, Jr., by and through his natural mother and general guardian, Brenda Patterson; and Tadd Dietz, by and through his natural mother and general guardian, Brenda Patterson, Counterclaim Plaintiffs,

v.

ALLSTATE INSURANCE COMPANY, an Illinois corporation, Counterclaim Defendant.

No. 93–C–898J.

United States District Court, D. Utah, Central Division.

March 8, 1995.

Gary L. Johnson, Robert G. Wright, Richards, Brandt, Miller & Nelson, Salt Lake City, Utah, for plaintiff.

Peter C. Collins and Douglas C. Tingey, Winder & Haslam, Salt Lake City, Utah, for defendants Brenda Patterson, Jens Martin Dietz, Jr., and Tadd Dietz.

David J. Holdsworth, Romney & Condie, Salt Lake City, Utah, for defendants Beverlee McLaughlin and Ray McLaughlin.

## MEMORANDUM OPINION AND ORDER

JENKINS, District Judge.

This is a declaratory judgment action to determine coverage under certain homeowners insurance policies. The plaintiff, Allstate Insurance Company, issued homeowners policies to defendant Beverlee McLaughlin and to defendants Clifford and Lila Forney.[1] In 1993 defendant Brenda Patterson and her sons, Jens Martin Dietz, Jr., and Tadd Dietz, sued Beverlee McLaughlin and her son, Ray, and the Forneys and their sons, Richard and Robert, in a Utah state court alleging that the McLaughlin and Forney boys had sexually abused the Dietz boys from about May 1989 until August 1991. The McLaughlin and Forney boys were between twelve and sixteen years old at the time, and the Dietz boys were between five and eight years old at the time. The second amended complaint in the state-court action asserts claims against the McLaughlin and Forney parents for negligent supervision and claims against the McLaughlin and Forney boys for battery, false imprisonment and intentional infliction of emotional distress, as well as "general claims," in which the plaintiffs allege that the McLaughlin and Forney boys, "without the intention of causing bodily injury and in violation of their duties of care to plaintiffs, engaged in inappropriate sexual contact with" the Dietz boys. *See* The Patterson and Dietz Defendants' Memorandum in Opposition to Allstate's Motion for Sum-

---

1. Mrs. Forney's name appears as "Leila" in the pleadings in this case, but apparently she spells her name "Lila." *See, e.g.,* The Patterson and Dietz Defendants' Supplemental Memorandum in Opposition to Allstate's Motion for Summary Judgment and in Support of Their Own Motion for Partial Summary Judgment [hereinafter Patterson Supplemental Memo.] (dkt. no. 71), ex. E.

mary Judgment and in Support of Their Own Motion for Partial Summary Judgment [hereinafter Patterson Memo.] (dkt. no. 47), ex. 3, at 5, ¶ 16. *See also id.* at 3, ¶ 11 (alleging that the Dietz boys "were subjected to inappropriate sexual contacts initiated by" the McLaughlin and Forney boys).[2]

Allstate brought this diversity action seeking a declaratory judgment that it has no duty to defend or indemnify its insureds, the McLaughlins and Forneys, in the state-court action. Allstate moved for summary judgment. The Patterson and Dietz defendants filed a cross-motion for partial summary judgment, seeking a judgment that Allstate has a duty to defend and indemnify with respect to their claims against the adult defendants (Beverlee McLaughlin and Clifford and Lila Forney) in the state-court action.[3]

The court first heard arguments on Allstate's motion for summary judgment in April 1994. Following the initial argument, the parties asked the court to stay its ruling on the motion until the parties had completed certain discovery. In September 1994 the parties submitted supplemental memoranda summarizing the facts developed through discovery. The court heard additional arguments on the parties' motions for summary judgment in December 1994, after which the parties submitted supplemental memoranda on the legal issue of whether the claims in the state-court action arose out of an "acci-

dent" as that term is used in the policies. Now, for the reasons discussed below, the court enters this memorandum opinion and order denying Allstate's motion for summary judgment and granting in part and denying in part the Patterson and Dietz defendants' motion for partial summary judgment.

## I.

## PROCEDURAL MOTIONS

As a preliminary matter, Allstate has filed a motion to strike the Patterson and Dietz defendants' motion for partial summary judgment on the grounds that it is untimely. The McLaughlins recognized that the time for filing a motion for summary judgment had passed and filed a motion for leave to file their own motion for partial summary judgment.

Technically, the Patterson and Dietz defendants' motion for partial summary judgment and the McLaughlins' proposed motion for partial summary judgment are untimely. The court entered a scheduling order on January 12, 1994, requiring all motions to be filed by March 1, 1994. The Patterson and Dietz defendants did not file their motion for partial summary judgment until April 1994, and the McLaughlins did not seek leave to file their own motion for partial summary judgment until June 1994. However, al-

---

2. When Allstate filed this action, the operative complaint in the state-court action was the plaintiffs' Amended Complaint, which alleged that the McLaughlin and Forney boys, "without the intention of causing bodily injury and in violation of their duties of care to plaintiffs, sodomized and otherwise sexually abused and otherwise abused and tormented" the Dietz boys. *See* Allstate Insurance Company's Complaint for Declaratory Judgment [hereinafter Complaint] (dkt. no. 1), ex. D at 5, ¶ 16. While this action was pending, Mrs. Patterson and her sons sought leave to file a second amended complaint in the state-court action. The proposed second amended complaint keeps the same basic claims as the amended complaint but alters some of the specific allegations. At oral argument on the parties' motions for summary judgment in December 1994, counsel for the Patterson and Dietz defendants represented to the court that the second amended complaint had been filed in the state-court action. Therefore, the court will treat the second amended complaint as the operative pleading.

3. Clifford and Lila Forney have filed for relief under the bankruptcy code, *see* Notice and Suggestions Regarding Bankruptcy Stay (dkt. no. 57), and therefore have not taken part in the proceedings in this court. However, they have entered into a stipulation with the plaintiffs in the state-court action under which the plaintiffs in that action will look solely to Allstate for any recovery and will not seek any recovery directly from Mr. and Mrs. Forney. In exchange for that commitment, the Forneys have agreed not to invoke in this action the automatic stay provision of the bankruptcy code, 11 U.S.C. § 362. *See* Stipulation Regarding Bankruptcy Proceeding of Clifford Forney and Lila Forney (dkt. no. 61). *Cf. Commercial Union Ins. Co. v. Johns–Manville Corp. (In re Johns–Manville Corp.),* 31 B.R. 965, 969–70 (S.D.N.Y.1983) (the automatic stay provision of the bankruptcy code applied to a declaratory judgment action brought by the debtor's insurer against the debtor to resolve a coverage dispute).

though the motion filing deadline was never extended, the parties recognized that relevant discovery was not completed by March 1, 1994. In fact, the parties asked the court to defer ruling on their motions until certain depositions were completed. *See* Stipulation and Motion Regarding Reservation on Ruling (dkt. no. 59). Those depositions were not completed until August 1994, and the parties did not submit the relevant deposition testimony to the court until September 1994.

■ Moreover, the defendants' proposed cross-motions raise one of the same issues as Allstate's motion for summary judgment, namely, whether Allstate has a duty to defend and indemnify with respect to the negligent supervision claim against the adult defendants in the state-court action. The court can grant summary judgment to a non-moving party if the relevant facts are undisputed and the party is entitled to a judgment as a matter of law. *See, e.g., Dickeson v. Quarberg,* 844 F.2d 1435, 1444 n. 8 (10th Cir.1988); 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2720 at 27–35 (2d ed. 1983 & Supp.1994), and cases cited therein. If the defendants are entitled to a judgment as a matter of law, the court should not prolong this action simply because the defendants were technically tardy in filing their motions. Therefore, the court will deny Allstate's motion to strike and allow the McLaughlin defendants to move for partial summary judgment to the same extent and on the same grounds as the Patterson and Dietz defendants.[4]

4. The McLaughlin defendants have not submitted a proposed motion for summary judgment, but their motion for leave to file a motion for partial summary judgment asks for leave "to make a Motion for Partial Summary Judgment on the issue of coverage for the allegedly negligent acts of Beverlee McLaughlin ... (similar in content to the Patterson Defendants' Motion of Partial Summary Judgment on that issue)." *See* McLaughlin Defendants' Request for Leave of Court to File a Supplemental Memorandum and Motion for Partial Summary Judgment (dkt. no. 60), at 2. Therefore, the court will treat the McLaughlin defendants as if they had joined in the Patterson and Dietz defendants' motion for partial summary judgment to the extent that the Patterson and Dietz defendants' motion seeks a determination of coverage for their negligent supervision claim against Beverlee McLaughlin.

## II.

### THE ALLSTATE POLICIES

There are actually three policies involved in this case—one issued to the McLaughlins and two to the Forneys. *See* Complaint exs. A–C. The McLaughlin policy (exhibit A to Allstate's Complaint) began in September 1987. The first Forney policy (exhibit B) covered the period from July 9, 1984, to July 9, 1989. The second Forney policy (exhibit C) began July 9, 1989. The McLaughlin and second Forney policies are identical in all relevant respects. The insuring provision of those policies states: "Subject to the terms, limitations and conditions of this policy, **Allstate** will pay damages which an **insured person** becomes legally obligated to pay because of **bodily injury** or **property damage** <u>arising from an accident</u> and covered by this part of the policy."[5] Complaint exs. A & C, at 23 (underlining added). The first Forney policy says that "**Allstate** will pay all sums <u>arising from an accidental loss</u> which an **insured person** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** covered by this part of the policy." Complaint ex. B, at 23 (underlining added). The court does not deem this difference in language significant for purposes of the pending motions.

The Allstate policy further provides that, if an insured person is sued for covered damages, Allstate "will provide a defense with counsel of **our** choice, even if the allegations are groundless, false or fraudulent." Complaint exs. A–C, at 23.

5. Boldface words in the policy are defined terms. "Allstate," "we" and "our" all refer to the insurer (Allstate). *See* Complaint ex. A, at 3. "Insured person" includes the person named on the policy's declarations page as the insured and any relative or dependent who is a resident of the named insured's household. *Id.* The parties do not dispute that Beverlee and Ray McLaughlin and Clifford, Lila, Richard and Robert Forney are all "insured persons" under their respective policies. "Bodily injury" means "physical harm to the body, including sickness or disease" (with certain exceptions that do not apply here). *Id.*

The Allstate policy excludes coverage for intentional or criminal acts. The intentional act exclusion in the McLaughlin and second Forney policies states:

> **We** do not cover **bodily injury** or **property damage** resulting from:
>
> a) An act or omission intended or expected to cause **bodily injury** or **property damage.** This exclusion applies even if the **bodily injury** or **property damage** is of a different kind or degree, or is sustained by a different person or property, than that intended or expected; or
>
> b) An act or omission committed by an **insured person** while insane or while lacking the mental capacity to control his or her conduct or while unable to form any intent to cause **bodily injury** or **property damage.** This exclusion applies only if a reasonable person would expect some **bodily injury** or **property damage** to result from the act or omission.

Complaint exs. A & C, at 23–24.

The criminal act exclusion in these policies reads:

> **We** do not cover **bodily injury** or **property damage** resulting from:
>
> a) A criminal act or omission; or
>
> b) An act or omission which is criminal in nature and committed by an **insured person** who lacked the mental capacity to appreciate the criminal nature or wrongfulness of the act or omission or to conform his or her conduct to the requirements of the law or to form the necessary intent under the law.
>
> This exclusion applies regardless of whether the **insured person** is actually charged with, or convicted of, a crime.

*Id.* at 24.

The first Forney policy combines the intentional and criminal act exclusions. The relevant exclusion in that policy reads: "**We** do not cover any **bodily injury** or **property damage** which may reasonably be expected to result from the intentional or criminal acts of an **insured person** or which are in fact intended by an **insured person.**" Complaint, ex. B, at 23, ¶ 1.

Allstate claims that it has no duty to defend or indemnify the McLaughlins and Forneys because the acts giving rise to the Patterson and Dietz claims were not accidental but intentional, if not criminal.

## III.

### COVERAGE

The scope of the duty an insurer such as Allstate owes its insured is determined by the terms of the policy. *Camelot by the Bay Condominium, Owners' Ass'n v. Scottsdale Ins. Co.,* 27 Cal.App.4th 33, 32 Cal.Rptr.2d 354, 364 (1994). As a general rule, however, an insurer owes its insured at least two duties—a duty to defend the insured in any action alleging damages covered by the policy and a duty to indemnify the insured for any loss covered by the policy.

■ Under Utah law, the duty to defend is broader than the duty to indemnify, but it is not unlimited. *Deseret Fed. Sav. & Loan Ass'n v. United States Fidelity & Guar. Co.,* 714 P.2d 1143, 1146 (Utah 1986). "[T]he duty to defend is measured by the nature and kinds of risks covered by the policy and arises whenever the insurer ascertains facts which give rise to the potential of liability under the policy." *Id.* "The question is whether the allegations [of a complaint against the insured], if proved, could result in liability under the policy," not whether the complainant can in fact prove the allegations, since the insurer has a duty to defend even if the allegations in the suit are groundless, false or fraudulent. *Id.* at 1147. *See also* Complaint exs. A–C, at 23. Thus, the question is whether the state-court action alleges facts that, if proved, could result in liability under the policy. If so, then Allstate has a duty to defend the state-court action and may have a duty to indemnify its insureds for any judgment entered against them in the state-court action.

Allstate's liability under the policy is limited to paying damages "which an insured person becomes legally obligated to pay because of bodily injury or property damage arising from an accident.…" *See* Complaint ex. A, at 23. Allstate does not dispute that the McLaughlins and Forneys are "in-

sured persons" within the meaning of the policy and that, if they are found liable in the state-court action, they could be "legally obligated to pay" damages "because of bodily injury." Allstate claims, however, that any bodily injury the Dietz boys suffered did not arise from an "accident." Unless the amended complaint in the state-court action alleges bodily injury "arising from an accident," there is no coverage under the policy, and the court need not consider any exclusions from coverage.

An insurer's duty to an insured depends on the nature of the claim asserted against the insured. *E.g., Lee v. Aetna Casualty & Sur. Co.,* 178 F.2d 750, 751 (2d Cir.1949); *SL Indus., Inc. v. American Motorists Ins. Co.,* 128 N.J. 188, 607 A.2d 1266, 1272 (1992); *Kenefick v. Hitchcock,* 187 Wis.2d 218, 522 N.W.2d 261, 266 (App.1994); *Darlow v. Farmers Ins. Exch.,* 822 P.2d 820, 827 (Wyo. 1991). *Cf. Error v. Western Home Ins. Co.,* 762 P.2d 1077, 1080–81 (Utah 1988) (insured entitled to coverage even though there was no coverage for the intentional conduct of her co-insured husband). The state-court plaintiffs have asserted separate claims against the McLaughlin and Forney boys and against the McLaughlin and Forney parents. The parties have treated the question of Allstate's duty to defend and indemnify the juvenile insureds separately from the question of its duty to defend and indemnify the parents, and the court will follow suit.

### A.

### *Coverage for the Minor Insureds*

The claims of Mrs. Patterson and her sons in the state-court action against the minor tort-feasors, Ray McLaughlin and Richard and Robert Forney, are generally for intentional torts. The state-court complaint alleges claims against the McLaughlin and Forney boys for battery, false imprisonment and intentional infliction of emotional distress. Patterson Memo. ex. 3, at 5–7. However, the state-court plaintiffs have also alleged a "general" claim that the McLaughlin and Forney boys, "without the intention of causing bodily injury and in violation of their duties of care to plaintiffs, engaged in inappropriate sexual contact with" the Dietz boys. *Id.* at 5, ¶ 16. Whether these allegations state a claim for bodily injury "arising from an accident" and hence are covered claims under the policy, giving rise to a duty to defend and perhaps indemnify, depends in part on the meaning of the term "accident" and the nature of the "inappropriate sexual contact."

### 1. *"Accident"*

■ The policy does not define "accident," and the Utah Supreme Court has never construed the term as used in a homeowners liability policy. As a general rule, however, under Utah law "insurance policies should be construed liberally in favor of the insured and their beneficiaries so as to promote and not defeat the purposes of insurance." *United States Fidelity & Guar. Co. v. Sandt,* 854 P.2d 519, 521 (Utah 1993) (quoting *Richards v. Standard Acc. Ins. Co.,* 58 Utah 622, 200 P. 1017, 1020 (1921)). The terms of an insurance contract are generally construed from the point of view of the average person and given their ordinary and usual meaning. *See, e.g., Sandt,* 854 P.2d at 523; *Hoffman v. Life Ins. Co.,* 669 P.2d 410, 416 (Utah 1983). But because insurance contracts are generally adhesion contracts, if there is any doubt as to meaning, "that interpretation is to be placed upon the words of the policy which is most favorable to the insured." *Sandt,* 854 P.2d at 522 (quoting *Browning v. Equitable Life Assurance Soc'y,* 94 Utah 570, 80 P.2d 348, 352 (1938) (referring to life insurance policies)).

The ordinary meaning of "accident" is something unintended and unexpected. Webster's, for example, defines the term as "an event or condition occurring by chance or arising from unknown or remote causes," "lack of intention or necessity," "an unforeseen unplanned event or condition." *Webster's Third New International Dictionary* 11 (1971). The parties agree that the ordinary meaning of the term "accident" implies something unplanned, unforeseen, unexpected or unintended. They disagree about what must be unexpected or unintended and by whom.

■ Allstate argues that unexpectedness must be determined from the standpoint of the insured, whereas the defendants claim that unexpectedness must be determined from the standpoint of the victim.[6] There is authority to support both positions,[7] sometimes even in the same case. For example, in *Hoffman v. Life Insurance Company of North America*, the Utah Supreme Court first stated that "a person is a victim of an accident when, from the victim's point of view, the occurrence causing the injury or death is not a natural and probable result of the victim's own acts." 669 P.2d 410, 416 (Utah 1983) (underlining added). But then the court went on to say that "the common meaning of the term is defined in terms of whether the event was naturally and probably expected or anticipated *by the insured.*" *Id.* (emphasis added). *Hoffman,* however, like many of the authorities construing "accident" from the victim's viewpoint, involved an accidental death insurance policy, where the victim and the insured were the same person.

The court believes that, in the context of a liability policy such as the homeowners policy involved in this case, the accidental nature of the event should be determined from the viewpoint of the insured:

> Because an injury is always fortuitous to a non-consenting victim, if its accidental character were to be judged in relation to such a victim, virtually all instances of compensable injury would also be instanc-

es of accident, and nothing would be accomplished by determining coverage in relation to [an "accident"] rather than injury alone.

*Vermont Mut. Ins. Co. v. Malcolm,* 128 N.H. 521, 517 A.2d 800, 802 (1986).

■ The more difficult question is, What must be unexpected—the injury-producing event or the injury itself? Allstate suggests that the act or occurrence causing the loss must be unintended or unexpected and that intentional acts (such as sexual molestation) can never be accidental. The defendants, on the other hand, argue that it is the injury itself and not the act that caused the injury that must be unintended and unexpected. Under the defendants' construction of the policy, if the insured's intentional acts bring about unintended results, that is enough to satisfy the policy's definition of "accident."[8]

Again, there is authority to support both positions. The Utah Court of Appeals recently rejected the argument that an insured who fired a shotgun at another person but claimed he did not intend to hurt the other person was entitled to coverage under his homeowners policy. *See State Farm Fire & Casualty Co. v. Geary,* 869 P.2d 952, 955–56 (Utah Ct.App.1994). The policy in *Geary* provided coverage for any claim against an insured for damages because of bodily injury "caused by an *occurrence*" and defined "occurrence" as "an accident ... which results

---

6. The difference is illustrated by the case of a car striking a pedestrian. Ordinarily, such an occurrence would be considered an accident regardless of the point of view, since neither the driver nor the pedestrian expected it. However, if the pedestrian intentionally threw himself in front of the car before the driver had a chance to apply his brakes, what might be an accident from the driver's viewpoint would generally not be considered an accident from the pedestrian's viewpoint.

7. *Compare, e.g., Black's Law Dictionary* 15 (6th ed. 1990) (defining "accident" as, among other things, "an event happening without any human agency, or if happening wholly or partly through human agency, an event which under the circumstances is unusual and unexpected *by the person to whom it happens*") (emphasis added); 10 Mark S. Rhodes, *Couch Cyclopedia of Insurance Law* § 41.9 at 14 (2d ed. rev. 1982) (defining "accident" as "any event which takes place without the foresight or expectation *of the person*

acted upon or affected thereby*") (emphasis added and footnote omitted), *with Vermont Mut. Ins. Co. v. Malcolm,* 128 N.H. 521, 517 A.2d 800, 802 (1986) (fortuity must be determined with reference to the insured) (per Souter, J.).

8. Counsel for the McLaughlins goes so far as to argue that, "as long as what juveniles do to other juveniles within the walls of their own home does not rise to the level of outright criminal physical conduct (murder, mayhem, theft, etc.), insurance companies take the risk of insuring against the perils of adolescence." The McLaughlin Defendants' Supplemental Memorandum in Opposition to Allstate's Motion for Summary Judgment (dkt. no. 70), at 13. Under Utah law, the scope of the risk an insurance company takes is determined by the terms of the policy, not by the expectations of the insured. *See Allen v. Prudential Prop. & Casualty Ins. Co.,* 839 P.2d 798, 807 (Utah 1992).

in ... bodily injury." *Quoted in id.* at 955. It was undisputed that Edwards, the insured, intentionally pulled the trigger on the shotgun. Edwards claimed, however, that he did not intend to hurt Geary and that therefore the shooting qualified as a covered "occurrence" because the resulting injury was accidental. The court concluded that the proper focus was on the accidental or intentional nature of the act (the shooting) and not the resulting injury:

> While the parties may dispute whether Edwards subjectively intended to injure Geary, that question is irrelevant to our analysis of whether there was an "occurrence" under the policy. Because Edwards intentionally fired the shotgun, his act of pulling the trigger qualifies as a "deliberate act." Hence, we conclude that Edwards's homeowners insurance policy was not designed to include as an "occurrence" an intentional shotgun blast without any independent intervening act, *even if the resulting injury was unintended.*

*Id.* at 956 (emphasis added). *Geary* adopted the reasoning of a line of Washington cases, which hold that an "accident is never present when a deliberate act is performed, unless some additional, unexpected, independent, and unforeseen happening occurs which produces or brings about the result of injury or death." *See id.* at 955 (emphasis omitted) (quoting *Safeco Ins. Co. v. Dotts*, 38 Wash. App. 382, 685 P.2d 632, 633–34 (1984), which in turn was quoting *Johnson v. Business Men's Assurance Co.*, 38 Wash.2d 245, 228 P.2d 760, 762 (1951)). *Accord Collin v. American Empire Ins. Co.*, 21 Cal.App.4th 787, 26 Cal.Rptr.2d 391, 403–04 (1994). *Geary*, however, is not controlling. *See, e.g.,*

Romero v. International Harvester Co., 979 F.2d 1444, 1449 n. 3 (10th Cir.1992).

In a long line of cases stretching back at least to Cardozo, other courts have found covered accidents where intentional acts brought about unintended or unexpected results. *See, e.g., Messersmith v. American Fidelity Co.*, 232 N.Y. 161, 133 N.E. 432, 433 (1921) ("Injuries are accidental or the opposite, for the purpose of indemnity, according to the quality of the results rather than the quality of the causes") (per Cardozo, J.); *Allstate Ins. Co. v. Sparks*, 63 Md.App. 738, 493 A.2d 1110, 1112 (Ct.Spec.App.1985); *Quincy Mut. Fire Ins. Co. v. Abernathy*, 393 Mass. 81, 469 N.E.2d 797, 799 (1984).[9] Under this construction of "accident," even an intentional tort, such as an assault, may be accidental. *See* Annotation, *Liability Insurance: Assault as an "Accident," or Injuries Therefrom as "Accidentally" Sustained, Within Coverage Clause*, 72 A.L.R.3d 1090 (1976), and cases cited therein. This court recently adopted such a definition of "occurrence" (defined in terms of an "accident") in the context of a comprehensive general liability (CGL) policy. *See Quaker State Minit–Lube, Inc. v. Fireman's Fund Ins. Co.*, 868 F.Supp. 1278, 1297 (D.Utah 1994) (concluding that the insured was entitled to coverage "unless it has [the] specific and subjective intent to cause" the damage giving rise to the claim against it) (citation omitted).

In a diversity action such as this, absent a decision of the state's highest court directly on point, the court must predict how the Utah Supreme Court would decide this case. *See, e.g., Adams–Arapahoe Sch. Dist. No. 28–J v. GAF Corp.*, 959 F.2d 868, 871 (10th Cir.1992); *Allstate Ins. Co. v. Jack S*, 709 F.Supp. 963, 965 (D.Nev.1989). There

9. The Utah Supreme Court recognized the New York cases following Justice Cardozo's view in *Deseret Federal Savings and Loan Association v. United States Fidelity & Guaranty Company*, 714 P.2d 1143 (Utah 1986), but stopped short of adopting their reasoning in that case because the judgment in the underlying action against the insured in that case conclusively established that the insured had intended not only its actions but also the consequences of its actions. *See* 714 P.2d at 1145–46. Utah has followed Justice Cardozo's view in other contexts. *See Handley v. Mutual Life Ins. Co.*, 106 Utah 184, 147 P.2d 319, 322–24 (1944) (death can be accidental within

the meaning of a life insurance policy providing accidental death benefits if it is an unexpected result of an intended act). *See also Winchester v. Prudential Life Ins. Co.*, 975 F.2d 1479, 1487 (10th Cir.1992) (recognizing that "Utah courts appear to have wavered somewhat" as to whether "accidental" in the context of an accident insurance policy means "accidental means" or "accidental results" and concluding that "Utah courts currently use the less strict standard of defining 'accidental' as a result that was not reasonably foreseeable even if the means causing the result was foreseeable or even intentional") (citations omitted).

are no Utah Supreme Court decisions on point. In contexts other than liability insurance, however, the Utah Supreme Court has construed the term "accident" or "accidental" broadly to cover either an unexpected cause of injury or an unexpected result. *See, e.g., Allen v. Industrial Comm'n,* 729 P.2d 15, 22 (Utah 1986) (construing the phrase "by accident" as used in the Utah workers' compensation act); *Hoffman v. Life Ins. Co.,* 669 P.2d 410, 415–17 (Utah 1983) (construing the words "accident" or "accidental" as used in an accidental death policy). Admittedly, these cases did not involve liability insurance, and other courts have been able to distinguish them on that basis. *See, e.g., Winchester,* 975 F.2d at 1485 (Utah cases interpreting the term "accidental" in the context of workers' compensation provide "no help in the insurance context"); *Geary,* 869 P.2d at 955 (distinguishing *Hoffman* on the grounds that it involved an accidental death policy, not a homeowners policy). *Cf. Quaker State,* 868 F.Supp. at 1297 (distinguishing *Geary* on the grounds that it involved a homeowners policy as opposed to a CGL policy). The Utah Supreme Court, however, has recognized that liability insurance is at least analogous to accidental death insurance and has relied on cases in the former field in construing cases in the latter. *See Hoffman,* 669 P.2d at 416 n. 2 & 417 n. 3.

This court is not convinced that the cases are irreconcilable and must necessarily be confined to air-tight compartments. In ordinary usage, "accident" is used to refer to both unexpected or unintended events and unexpected or unintended results, depending on the circumstances. For example, one would ordinarily say that a driver who collides with another vehicle as a result of intentionally driving his car faster than the speed limit or intentionally driving while intoxicated is involved in an "accident." Similarly, a man and woman who intentionally engage in sexual intercourse may refer to a resulting pregnancy as an "accident." Or a person who intentionally ingests a controlled substance and dies of an overdose may be said to have died "accidentally." Whether, in a particular case, an intentional act leading to unintended harm is considered accidental or not generally depends on the likelihood that

the intentional act will result in harm of the type that in fact occurred. *See, e.g., Hardy v. Beneficial Life Ins. Co.,* 787 P.2d 1, 2–3 (Utah Ct.App.), *cert. denied,* 795 P.2d 1138 (Utah 1990).

> An effect which is the natural and probable consequence of an act or course of action is not an accident, nor is it produced by accidental means. It is either the result of actual design, or it falls under the maxim that every man must be held to intend the natural and probable consequence of his deeds.

*Hoffman,* 669 P.2d at 415 (quoting *Richards v. Standard Accident Ins. Co,* 58 Utah 622, 200 P. 1017, 1023 (1921), which in turn was quoting *Western Commercial Travelers' Ass'n v. Smith,* 85 F. 401, 405 (8th Cir.1898)). *Richards* defined "the natural and probable consequence" of an act as follows: "The natural consequence of means used [is] the consequence which ordinarily follows from their use—the result which may be reasonably anticipated from their use, and which ought to be expected." 200 P. at 1023, *quoted in Hoffman,* 669 P.2d at 416. If the natural and probable consequence of an insured's actions is substantially certain to be injury to another, that is, if his act was "inherently injurious" such that "the injury was certain to follow from it," then the actions and resulting injury may not be deemed accidental, even if the insured did not subjectively intend to cause the injury. *See Vermont Mut.,* 517 A.2d at 803.

Justice Souter has given the following example of intentional acts that are or are not accidental, depending on the circumstances:

> [If] an insured driver negligently but quite intentionally made a right turn and injured a pedestrian who, unbeknownst to him, was stepping from the curb into the insured's new line of travel[, the act would be considered accidental, and coverage would apply]. But if the insured saw the victim stepping from the curb and proceeded to make his turn with an intent to strike the victim, his use of the automobile as a weapon [would be] so inherently injurious that the collision would not be regarded as [an accident and hence] an "occurrence" even if the insured did not actually intend

to break any bones. In each example the insured acted intentionally; in each the particular injury was unintended. The act as a cause of injury was accidental in the one case, but not in the other.

*Id.*

■ This distinction between intentional acts that result in unintended and unexpected injuries and intentional acts that result in injuries that, although unintended, should have been expected is consistent with Utah cases construing the term "accident" or "accidental" in other contexts. In the workers' compensation area, for example, the Utah Supreme Court has found work-related injuries accidental where they arose out of activities that could normally be performed without any injury (or without incurring the particular type of injury sustained), such as where a claimant suffered a heart attack while unloading coal, *Bamberger Coal Co. v. Industrial Comm'n,* 66 Utah 203, 240 P. 1103 (1925), or cleaning out a reservoir, *Hammond v. Industrial Comm'n,* 84 Utah 67, 34 P.2d 687 (1934), or where an employee suffered a ruptured aorta from driving a caterpillar tractor over rough ground, *Columbia Steel Co. v. Industrial Comm'n,* 92 Utah 72, 66 P.2d 124 (1937), or where a worker injured his back while lifting his foot from the brake pedal of a delivery truck, *Purity Biscuit Co. v. Industrial Comm'n,* 115 Utah 1, 201 P.2d 961 (1949). In each of those cases, the results were qualitatively different from what one would expect from the conduct.

On the other hand, where the insured should have expected the injury from the activity, the court has held that the resulting injury was not accidental. For example, where an insured knew his medical history, knew or should have known that he was in poor physical condition and was a poor surgical risk and knew he had suffered severe post-operative shock following a previous, less serious operation, the court held that his death from post-operative shock was not exclusively "accidental" within the meaning of a double indemnity provision of a life insurance policy, since "[p]ost-operative shock to a dangerous degree was very likely." *Kellogg v. California W. States Life Ins. Co.,* 114 Utah 567, 201 P.2d 949, 952 (1949).

Whether or not an insured should expect injury from an intentional act is generally a question of fact, to be determined from all the surrounding facts and circumstances. For example, in *Hoffman* the court held, in the context of an accidental death policy, that whether or not the deceased should have expected to have been shot by police while exiting his vehicle with a gun depended on whether or not the insured had threatened the lives of the officers surrounding his car, such as by pointing his weapon at them. The court stated, "The critical question with respect to this aspect of the law is whether the insured should have expected that the natural and probable result of his exiting the vehicle with the gun would be his being shot by the officers." 669 P.2d at 418. "Where the insured's conduct threatens death or serious bodily injury to another, the insured should expect or anticipate that the threatened individual will very likely respond with deadly force. Under those circumstances the death is not considered accidental." *Id.* The court remanded the case for a determination of whether Hoffman in fact threatened the lives of the officers. *See id.*

Some actions, however, are so likely to result in injury that, as a matter of law, the court will find that the injury did not result from an accident regardless of the actor's subjective intent or expectations. For example, in *Geary* the insured's actions (firing a loaded shotgun at another person) was so likely to result in injury that, as a matter of law, the shooting was not accidental, regardless of whether the insured intended to harm the other person or not. In such a situation, the law simply will not allow "the insured's own self-serving testimony" that he did not intend any harm to overcome the presumption that people intend the natural and probable consequence of their acts. *See Roe v. State Farm Fire & Casualty Co.,* 259 Ga. 42, 376 S.E.2d 876, 877 (1989).

Ordinarily, sexual molestation of a minor by an adult falls within this latter category of cases, in which the resulting injury is so likely to follow the conduct that the insured will not be heard to deny any intent to injure. Whether the case turns on the lack of any "accident" or "occurrence" or on the applica-

bility of an intentional act or injury exclusion, the vast majority of cases have denied coverage for sexual abuse of minors by adults. *See, e.g., Wiley v. State Farm Fire & Casualty Co.,* 995 F.2d 457, 460–68 (3d Cir.1993) (intended harm exclusion; intent inferred as a matter of law);[10] *Allstate Ins. Co. v. McCranie,* 716 F.Supp. 1440, 1446 (S.D.Fla. 1989) (no accident), *aff'd,* 904 F.2d 713 (11th Cir.1990); *Allstate Ins. Co. v. Talbot,* 690 F.Supp. 886, 888 (N.D.Cal.1988) (no "accidental loss"); *McCullough v. Central Fla. YMCA,* 523 So.2d 1208, 1208–09 (Fla.Dist.Ct. App.1988) (no "accident" resulting in bodily injury either expected or intended by the insured), *approved,* 546 So.2d 1050 (Fla. 1989); *Roe v. State Farm,* 376 S.E.2d at 876–77 (intentional injury exclusion); *Vermont Mut.,* 517 A.2d at 802–03 (no "occurrence"); *Allstate Ins. Co. v. Mugavero,* 79 N.Y.2d 153, 581 N.Y.S.2d 142, 145–46, 589 N.E.2d 365, 368–70 (N.Y.1992) (intentional harm exclusion), *rev'g* 166 A.D.2d 474, 561 N.Y.S.2d 35 (1990); *Aetna Casualty & Sur. Co. v. Roe,* 437 Pa.Super. 414, 650 A.2d 94, 102 (1994) (intentional injury exclusion). *See also Allstate Ins. Co. v. Mugavero,* 166 A.D.2d 474, 561 N.Y.S.2d 35, 43–47 (1990) (Balletta, J., dissenting), and cases cited therein.

That is because some injury is inevitable in such situations. *See, e.g., Wiley,* 995 F.2d at 464 ("harm to children in sexual molestation cases is inherent in the very act of sexual assault committed on a child, regardless of the motivation for or nature of such assault"); *Foremost Ins. Co. v. Weetman,* 726 F.Supp. 618, 622 (W.D.Pa.1989) ("In situations such as this, injury always ensues"), *aff'd,* 904 F.2d 694 (3d Cir.1990); *Whitt v. DeLeu,* 707

F.Supp. 1011, 1016 (W.D.Wis.1989) ("sexual misconduct with a minor is objectively so substantially certain to result in harm to the minor victim, that the perpetrator cannot be allowed to escape society's determination that he or she is expected to know that"); *J.C. Penney Casualty Ins. Co. v. M.K.,* 52 Cal.3d 1009, 278 Cal.Rptr. 64, 70, 804 P.2d 689, 695 (Cal.) (in cases of child molestation, "[t]he act is the harm"; "[t]here cannot be one without the other"), *cert. denied,* 502 U.S. 902, 112 S.Ct. 280, 116 L.Ed.2d 232 (1991); *Roe v. State Farm,* 376 S.E.2d at 877 ("Child molestation and the injury caused by it are so closely tied as to be virtually inseparable"); *Vermont Mut.,* 517 A.2d at 802 (sexual assault on a minor is so "inherently injurious" that it cannot be performed without causing the resulting injury); *Mugavero,* 581 N.Y.S.2d at 146, 589 N.E.2d at 369 (approving of the insurer's argument that, in a case of child molestation, "cause and effect cannot be separated; that to do the act is necessarily to do the harm which is its consequence"); *Mugavero,* 561 N.Y.S.2d at 44, 42 (Balletta, J., dissenting) (sexual molestation of children "is an act so permeated with the consequent injury" that it is "completely unreasonable to believe that the acts of sexual misconduct . . . could result in anything but harm to the children"); *K.A.G. v. Stanford,* 148 Wis.2d 158, 434 N.W.2d 790, 793 (App.1988) ("acts of sexual molestation against a minor are so certain to result in injury to that minor that the law will infer an intent to injure on behalf of the actor without regard to his or her claimed intent"), *review denied,* 439 N.W.2d 142 (Wis.1989).

---

**10.** Initially, courts adopted three different approaches for determining whether an insured who sexually molests another intended to cause injury and thus whether an intentional injury exclusion applied:

> The first of these . . . seeks the insured's actual, subjective intent to cause injury. The second is the objective test, which inquires whether a reasonable person would have foreseen that his action would cause harm. The third approach, and that taken by the vast majority of courts that have considered the issue, is the inference test, by which intent to harm is inferred from the nature of the act of sexual molestation or abuse regardless of the standard that governs other types of cases.

*Horace Mann Ins. Co. v. Fore,* 785 F.Supp. 947, 952 (M.D.Ala.1992) (citing *Allstate Ins. Co. v. Roelfs,* 698 F.Supp. 815, 820 (D.Alaska 1987)). The third approach—the so-called inferred intent rule—"is now the unanimous rule among jurisdictions that have considered the issue." *B.B. v. Continental Ins. Co.,* 8 F.3d 1288, 1293 (8th Cir.1993) (footnotes omitted). Courts in at least thirty-four jurisdictions have now adopted the inferred intent rule in such cases. *See Wiley,* 995 F.2d at 461 nn. 5 & 6, and *State Farm Fire & Casualty Co. v. Davis,* 612 So.2d 458, 463–64 & nn. 4–5 (Ala.1993), and cases cited therein. Utah has not yet considered the issue.

Where the perpetrator of the sexual abuse is also a minor, however, the law is not so clear.[11] Some courts have treated minor perpetrators the same as adult perpetrators and have denied coverage regardless of the minor's subjective intent. *See B.B. v. Continental Ins. Co.,* 8 F.3d 1288, 1295–96 (8th Cir.1993) (applying the inferred intent rule to an insured who was 14 and 15 years old when the sexual molestation occurred); *Allstate Ins. Co. v. Roelfs,* 698 F.Supp. 815, 820–21 & n. 6 (D.Alaska 1987) (applying inferred intent rule to 16–year–old boy); *State Farm Fire & Casualty Co. v. Robin R.,* 264 Cal.Rptr. 326, 330 (Cal.Ct.App.1989) (applying irrebuttable presumption of intent to harm to a boy who was 14 and 15 at the time of the sexual molestation), *review dismissed,* 279 Cal.Rptr. 779, 807 P.2d 1008 (1991); *D.W.H. v. Steele,* 512 N.W.2d 586, 589 (Minn.1994) (applying the inferred intent rule to 11– or 12–year–old boy); *Illinois Farmers Ins. Co. v. Judith G.,* 379 N.W.2d 638, 641–43 (Minn.Ct.App.1986) (applying inferred intent rule to a boy who was between the ages of 13 and 16 when the sexual abuse allegedly occurred). Other courts, however, have refused to infer an intent to harm to minors who sexually molest other minors. *See Allstate Ins. Co. v. Jack S,* 709 F.Supp. 963, 966 (D.Nev.1989) (alleged abuser was 14–year–old girl); *Fire Ins. Exch. v. Diehl,* 206 Mich.App. 108, 520 N.W.2d 675, 680–81 (1994) (alleged abuser was 7 or 8 years old at the time of the first assault and 9 years old at the time of the second). *See also Heather F. v. Topa Ins. Co.,* 13 Cal.Rptr.2d 783, 787–94 (Cal.Ct.App. 1992) (refusing to equate the sexual behavior of a 12–year–old with the criminal sexual molestation of an adult and concluding that triable issues of fact existed as to the child's intent); *Cuervo v. Cincinnati Ins. Co.,* No. 93APE12–1715, 1994 WL 521161, at *2 (Ohio Ct.App. Sept. 22, 1994) ("the capacity of a minor to form the requisite intent to injure presents an issue of fact, not a conclusion of law"), *motion to certify appeal allowed,* 71 Ohio St.3d 1466, 644 N.E.2d 1388 (1995).

Courts that infer an intent to harm in the case of a minor sex abuser focus on the harm inherent in such activities rather than on the status of the perpetrator; that is, they focus on the act and not the actor. *See B.B.,* 8 F.3d at 1296; *Robin R.,* 264 Cal.Rptr. at 330. However, not all sexual contact is inherently harmful. Sexual contact between consenting adult couples, for example, is generally not considered physically harmful. It is the combination of the act and the status or age of the victim that makes sexual abuse of children inherently harmful. *See Barthelemy,* 33 F.3d at 193 (the reason for the rule of inferred intent "is a societal recognition that, because a child lacks the capacity to give consent, sexual activity foisted upon that child by an insured adult raises the irrebuttable inference that the adult intended to harm that child"; the reason for the rule "is inexorably intertwined with the tender age of the child"). If the age of the victim is relevant, then arguably the age of the perpetrator should also be relevant. The reason a child lacks the capacity to consent to sexual activity is because the child cannot fully appreciate the consequences of such activity. But if a child cannot fully appreciate the consequences of sexual activity, that is reason not to hold the child perpetrator to the same standard as an adult. As the court noted in *Jack S.,* criminal statutes that make it a crime to engage in sexual acts with a minor regardless of the minor's consent are based on the premise that minors lack the experience necessary to give meaningful consent, yet "courts cannot seek to protect naive fourteen-year-old[s] . . . on the one hand, while inferring the most degrading and unnatural [intentions] to them on the other hand." 709 F.Supp. at 966.

The reason for inferring intent in cases of sexual contact with minors is not simply that

---

11. The same is also true where the victim is not a minor. Some courts have refused to extend the inferred-intent rule to cases involving adult victims, reserving the rule for the "exceptional" case where the victim was a minor. *See, e.g., Aetna Life & Casualty Co. v. Barthelemy,* 33 F.3d 189, 192–93 (3d Cir.1994) (refusing to apply the rule where the victim of an alleged sexual assault was nineteen years old); *R.W. v. T.F.,* 510 N.W.2d 231, 236 (Minn.Ct.App.1994) (refusing to infer an intent to harm in a case of consensual sexual contacts between adults). *Compare Rivera v. Nevada Medical Liab. Ins. Co.,* 107 Nev. 450, 814 P.2d 71, 73–74 (1991) (adopting inferred-intent rule in the case of a rape of an adult).

sexual conduct is inherently harmful but that common experience has shown it to be harmful to minors. But minor perpetrators may be lacking in common experience. They may have "a lack of experiential knowledge of the consequences when one's body, rather than a gun, lead pipe, or bazooka, is the offending instrumentality." *See Fore,* 785 F.Supp. at 952. Their only experience with sexual matters may be portrayals in the media of sexual contacts between consenting adults, which may leave them ill-equipped to draw the inference that sexual contact with minors is inherently harmful. Courts that have refused to infer intent to a minor sex abuser have reasoned that "it is too broad a leap in logic to find that a minor intended to injure another minor by engaging in sexual acts. Knowledge which may be inferred to an adult may not be properly inferred to a child." *See Jack S,* 709 F.Supp. at 966.

Utah law recognizes that children do not always appreciate dangers as adults do. Under Utah law,

> [o]rdinarily a child under seven years of age is conclusively presumed not guilty of contributory negligence. Between the ages of seven and fourteen, in the absence of [a] showing to the contrary, an infant is generally assumed not to have the same consciousness of danger and the same judgment in avoiding it as an adult. Above the age of fourteen, in the absence of a showing to the contrary, an infant is generally charged with having attained that development which imposes upon him the same degree of care as an adult.

*Kilpack v. Wignall,* 604 P.2d 462, 466 (Utah 1979) (quoting *Nelson v. Arrowhead Freight Lines,* 99 Utah 129, 104 P.2d 225, 228 (1940)). *See also Mann v. Fairbourn,* 12 Utah 2d 342, 366 P.2d 603, 606 (1961) ("[t]he degree of care required of a child must be graduated to its age, capacity, and experience, and must be measured by what might ordinarily be expected from a child of like age, capacity and experience under similar conditions") (citation omitted).

The Utah Court of Appeals has specifically recognized that sexual contact between minors does not necessarily imply an intent to injure. *Doe v. Doe,* 878 P.2d 1161, 1162–63 (Utah Ct.App.1994). *Doe* involved the sexual molestation of a seven-year-old girl by a ten-year-old boy. The girl brought an action against the boy for negligence, alleging reckless disregard for her safety. The boy moved for summary judgment on the grounds that his acts were intentional and therefore not negligent or reckless. The trial court granted his motion, but the court of appeals reversed. The court stated: "An individual's acts can simultaneously give rise to a claim for negligence and a claim for an intentional tort. The two doctrines are not necessarily mutually exclusive, but rather may overlap and coexist on a continuum." *Id.* at 1162. The court noted the distinction between reckless misconduct, which "is a form of negligence," and intentional misconduct: "An intentional tort requires an intent to harm or a substantial certainty that harm will result from the act, while reckless misconduct requires only that there is a 'strong probability' that harm may result." *Id.* at 1163 & n. 1 (quoting *Matheson v. Pearson,* 619 P.2d 321, 322 (Utah 1980)). "[W]hen a person, with no intent to cause harm, intentionally performs an act so unreasonable and dangerous that he knows or should know [that] it is highly probable that harm will result," he is guilty of reckless misconduct but not intentional wrongdoing. *Id.* at 1163 (quoting *Matheson,* 619 P.2d at 322).[12] The

---

12. Courts generally recognize that policies insuring against accidental loss can cover losses resulting from reckless misconduct. *See, e.g., Harrington v. New England Mut. Life Ins. Co.,* 873 F.2d 166, 168–70 (7th Cir.1989) (life insurance policy provided accidental death benefits for an insured who died from injuries sustained as a result of a high-speed police chase after he had kidnapped and raped a woman at gunpoint) (applying Illinois law); *Entertainment Innovators, Inc. v. Scottsdale Ins. Co.,* 839 F.Supp. 654, 660 (W.D.Ark.1993) (construing CGL policy and applying Arkansas law); *Kline v. Kemper Group,* 826 F.Supp. 123, 128–29 (M.D.Pa.1993) ("accident" means harm brought about by negligent or reckless but not intentional conduct) (applying Pennsylvania law), *aff'd,* 22 F.3d 301 (3d Cir. 1994); *United States Fidelity & Guar. Co. v. Perez,* 384 So.2d 904, 905 (Fla.Dist.Ct.App.) (dicta to that effect), *review denied,* 392 So.2d 1381 (Fla. 1980); *Worcester Ins. Co. v. Fells Acres Day School, Inc.,* 408 Mass. 393, 558 N.E.2d 958, 970–71 (1990) (negligent omissions by directors and officers of a day-care center where children were allegedly abused amounted to reckless, not

court further noted that, whether the minor defendant was capable of acting recklessly and whether his conduct constituted reckless (as opposed to intentional) misconduct were "fact-sensitive" issues. 878 P.2d at 1163 & n. 2. The court remanded the case for the necessary factual determinations.

■ This court concludes that the Utah Supreme Court would not automatically infer an intent to harm in the case of a minor who sexually assaults other minors but would look at all the surrounding facts and circumstances, including the parties' ages, the nature of their relationship and their past experience. If, for example, because of his age and lack of experience, a minor perpetrator could not reasonably be expected to know that his actions would cause harm, any resulting harm may have been accidental from the standpoint of the insured minor. On the other hand, if the minor perpetrator were old enough and sufficiently experienced to recognize that his actions were substantially certain to cause harm, the mere fact that he professes that he intended no harm by his actions would not be sufficient to make his conduct accidental. But anything less than knowledge to a substantial certainty may only amount to reckless misconduct, *see Matheson* 619 P.2d at 322–23 (quoting Restatement (Second) of Torts § 500 comment *f* (1965)), for which there may be coverage, *see supra* note 12.

Whether the McLaughlin and Forney boys' misconduct was intentionally harmful

or merely reckless and stupid is a fact-sensitive question, *see Doe*, 878 P.2d at 1163, and the relevant facts in this case are disputed. The picture of the McLaughlin and Forney boys that emerges from the Dietz boys' depositions is that of bullies whose sexual molestation of the younger boys was part of their domineering and intentionally abusive behavior. According to the Dietz boys, the older boys abused them repeatedly over at least two summers and secured their silence by threats of violence, among other things.[13] The older boys do not deny that sexual contact took place, but they claim that it was much less, over a much more limited period of time and under different circumstances. According to Robert Forney, the sexual contacts were in the nature of experimentation among friends. He testified that all the boys participated willingly in the activities and that, as far as he could tell, the Dietz boys "appeared to have as much fun as everyone else that was there." Deposition of Robert James Forney (Hartranft), ex. C to Patterson Supplemental Memo., at 147. Robert testified that he was not sure who asked who or how the sexual activity started: "It's kind of like everyone was talking about it and it just happened." *Id.* at 141. According to Ray McLaughlin, "mostly we were just friends and just experimenting around." Deposition of Verne Ray McLaughlin, ex. A to Patterson Supplemental Memo., at 85. According to the older boys, the Dietz boys performed the same acts with each other as with the older boys, and the older boys per-

---

wilful, conduct and were therefore covered by the center's "special multi-peril" policy; *Sullivan v. Great Plains Ins. Co.,* 210 Neb. 846, 317 N.W.2d 375, 379 (1982) (a policy covering liability arising from an accident "does not cover an injury resulting from the willful act of [the] insured, but it does cover claims based on negligence, recklessness, or wanton misconduct, where no intent or purpose to injure is shown") (quoting 45 C.J.S. *Insurance* § 829 at 887–88 (1946)); *Allstate Ins. Co. v. Zuk,* 78 N.Y.2d 41, 571 N.Y.S.2d 429, 430–32, 574 N.E.2d 1035, 1036–38 (1991) (homeowners policy covered the insured's reckless shooting of another person); *Hoffman,* 669 P.2d at 417 (accidental death policy covers death resulting from an insured's reckless conduct); *Hardy v. Beneficial Life Ins. Co.,* 787 P.2d 1, 3 (Utah Ct.App.) (accidental death policy covered insured's death from reckless drug overdose), *cert. denied,* 795 P.2d 1138 (Utah 1990). *Cf. J.C. Penney Casualty Ins. Co. v. M.K.,*

52 Cal.3d 1009, 278 Cal.Rptr. 64, 69–70, 804 P.2d 689, 694–95 ("Certainly no one would contend that an injury occasioned by ... reckless driving was not accidental within the meaning of a policy of accident insurance") (citation omitted), *cert. denied,* 502 U.S. 902, 112 S.Ct. 280, 116 L.Ed.2d 232 (1991).

**13.** Relevant portions of Jens Dietz's deposition are attached as exhibit B to Allstate's supplemental memorandum in support of its motion for summary judgment, *see* Exhibits to Allstate Insurance Company's Supplemental Memorandum in Support of Its Motion for Summary Judgment (dkt. no. 68), and as exhibit F to the Patterson Supplemental Memo. Relevant portions of Tadd Dietz's deposition are attached as exhibit C to Allstate's supplemental memorandum and as exhibit G to the Patterson Supplemental Memo.

formed the same acts with each other as with the Dietz boys. *See id.;* Deposition of Verne Ray McLaughlin, at 35 & 38. Ray McLaughlin testified that he did not recall anyone ever telling him that it was wrong to have sex with young boys and that he did not know that at the time. Deposition of Verne Ray McLaughlin at 64. Similarly, Robert Forney testified that no one had ever discussed with him the inappropriateness of sexual contacts with young boys and that he never thought about the relative ages of the boys. *See* Deposition of Robert James Forney (Hartranft), at 159. Not surprisingly, all three of the older boys deny any force, violence, threats of violence or intent to injure. *See, e.g., id.* at 106; Deposition of Verne Ray McLaughlin, at 38, 79, 83–84; Deposition of Richard Christian Forney (Hartranft), ex. B to Patterson Supplemental Memo., at 104, 116.

■ Under the facts of this case, the court cannot say that, as a matter of law, Allstate has no duty to defend the McLaughlin and Forney boys in the state-court action under the insuring provision of its policies.[14] The state-court complaint alleges that the McLaughlin and Forney boys engaged in inappropriate sexual contact with the Dietz boys beginning in or about May 1989. *See* Second Amended Complaint, ex. 3 to Patterson Memo., at 3, ¶ 10. At that time, Richard Forney, the oldest of the three older boys, was not yet fourteen years old, *see* Deposition of Richard Christian Forney (Hartranft), ex. B to Patterson Supplemental Memo., at 7, so the presumption that the minor tort-feasors had the same capacity as adults to understand the consequences of their actions would not apply. The state-court complaint also alleges that the McLaughlin and Forney boys engaged in inappropriate sexual contact with the Dietz boys "without the intention of causing bodily injury," Second Amended Complaint at 5, ¶ 16, suggesting that the McLaughlin and Forney boys' alleged wrongdoing may have been only reckless and not intentionally wrongful. *See Doe,* 878 P.2d at 1163 & n. 1. Thus, comparing the allegations of the complaint with the terms of the poli-

cies, the court cannot say there is no possibility of coverage under the policies. Moreover, the deposition testimony, disputed as it is, does not preclude the possibility that the McLaughlin and Forney boys were only reckless and not intentional tort-feasors and therefore entitled to coverage. Of course, if the trier of fact chooses to believe the Dietz boys' testimony and disbelieve the older boys' testimony, it may well find that the older boys intentionally injured the younger boys, in which case there may be no coverage. But that determination is best made by the jury in the state-court action, which must decide whether the older boys' actions amounted to intentional misconduct (as alleged, for example, in the state-court plaintiffs' third and fifth causes of action, alleging claims for battery and intentional infliction of emotional distress respectively) or whether *the older boys' actions were only reckless* (as suggested in the state-court plaintiffs' second cause of action).

## 2. *Exclusions*

■ Allstate next argues that, even if the state-court complaint alleges bodily injury arising from an "accident" within the meaning of the policies, there still is no coverage because of the intentional and criminal act exclusions of the policy. Allstate has the burden of proving that any exclusion applies. *See, e.g., LDS Hosp. v. Capitol Life Ins. Co.,* 765 P.2d 857, 859–60 (Utah 1988); *MacKenzie v. Mutual Benefit Life Ins. Co.,* 528 P.2d 150, 151 (Utah 1974).

■ The intentional act exclusion of the Allstate policies is really an intentional injury exclusion. It excludes coverage for bodily injury resulting from "[a]n act or omission intended or expected to cause **bodily injury**." Complaint, ex. A, at 23, ¶ 1. Courts construing such exclusions have concluded that they do not exclude coverage for an insured's intentional acts unless the insured also intended to cause the resulting harm. *See, e.g., Aetna Life & Casualty Co. v. Barthelemy,* 33 F.3d 189, 191 (3d Cir.1994) (applying Pennsylvania law); *Allstate Ins. Co. v. McCranie,* 716 F.Supp. 1440, 1445 (S.D.Fla.

---

14. A fortiori, the court also cannot say at this time that Allstate has no duty to indemnify the McLaughlin and Forney boys for any judgment in the state-court action.

1989) (applying Florida law), *aff'd,* 904 F.2d 713 (11th Cir.1990); *Allstate Ins. Co. v. Roelfs,* 698 F.Supp. 815, 819 (D.Alaska 1987) (citing 7A J. Appleman, *Insurance Law & Practice* § 4501.09 (rev. ed. 1979)); *American Family Mut. Ins. Co. v. Pacchetti,* 808 S.W.2d 369, 371 (Mo.1991); *Eisenman v. Hornberger,* 438 Pa. 46, 264 A.2d 673, 674–75 (1970) (the "vast majority of courts" that have considered intentional act exclusions in homeowners policies have concluded that, "before the insurer may validly disclaim liability, it must be shown that the insured intended by his act to produce the damage which did in fact occur"). *See also* James L. Rigelhaupt, Jr., Annotation, *Construction and Application of Provision of Liability Insurance Policy Expressly Excluding Injuries Intended or Expected by Insured,* 31 A.L.R.4th 957, § 5[a] (1984), and cases cited therein. Courts have also held that such clauses do not exclude coverage for reckless or grossly negligent misconduct. *See, e.g., Barthelemy,* 33 F.3d at 193; *McCranie,* 716 F.Supp. at 1445.

Allstate's argument based on the intentional injury exclusion suffers from the same problems as its argument based on the alleged lack of any "accident." For the reasons stated above, the court concludes that, under the facts of this case, the Utah Supreme Court would not infer an intent to harm as a matter of law. The state-court complaint alleges that the juvenile defendants lacked any intent to cause bodily injury, and the minor defendants have denied such intent. Whether or not the defendants should have "expected" their acts to cause bodily injury depends on exactly what their acts were, the circumstances under which they were committed and what the defendants should have reasonably expected given their age, capacity and experience, which in turn depend on disputed testimony. Therefore, Allstate is not entitled to summary judgment based on the intentional act exclusion in its policies.

 The criminal act exclusion excludes coverage for bodily injury resulting from "[a] criminal act or omission." Complaint, ex. A, at 24, ¶ 2. Allstate has not identified any criminal statute that the defendants are al-

leged to have violated, nor has it shown that the elements of any offense have been established as a matter of law. Under Utah law, "[a] person is not criminally responsible for conduct performed before he reaches the age of fourteen years." Utah Code Ann. § 76–2–301 (1990). Thus, there is a real question as to whether the criminal act exclusion even applies to a juvenile offender. At least at the time of the first alleged incident, all of the juvenile tort-feasors in this case were under age fourteen and thus arguably incapable as a matter of law of committing a crime.

The court recognizes that the criminal act exclusion in two of the Allstate policies applies not only to criminal acts but also covers "[a]n act or omission which is criminal in nature and committed by an **insured person** who lacked the mental capacity to appreciate the criminal nature or wrongfulness of the act or omission or to conform his or her conduct to the requirements of the law or to form the necessary intent under the law." Complaint exs. A & C at 24, ¶ 2. Whether or not this provision of the exclusion would apply, however, depends on the insureds' mental capacity, which is a genuine issue of material fact.

Allstate does not contend that there is no genuine issue of material fact as to the insureds' mental capacity and condition. Instead, it argues that an insured's mental state is irrelevant under the criminal act exclusion. The plain language of the exclusion refutes the argument. The exclusion requires a "criminal act or omission." Under Utah law, "no conduct is a crime unless made so by" statute or ordinance. Utah Code Ann. § 76–1–105 (1990). For conduct to constitute a crime, not only must it be prohibited by law, but also the person committing the prohibited conduct must act with the requisite mental state. *See id.* § 76–2–101; *State v. Elton,* 680 P.2d 727, 728 (Utah 1984); *State v. Casias,* 567 P.2d 1097, 1098 (Utah 1977). The cases from other jurisdictions that Allstate relies on at best only create an ambiguity in the exclusion, and, under Utah law, any ambiguity must be construed against Allstate and in favor of coverage. *See, e.g., United States Fidelity & Guar. Co.*

*v. Sandt,* 854 P.2d 519, 522–23 (Utah 1993); *LDS Hosp.,* 765 P.2d at 858.

The court concludes that, on the present state of the record, Allstate has not met its burden of showing that the criminal act exclusion applies under the facts of this case.

### 3. *Public Policy*

■ Allstate next argues that public policy prohibits coverage for "egregious and criminal conduct" such as sexual molestation and that, if the court were to find coverage in this case, it would send a message that insureds "have a license to commit whatever act they wish and expect to receive insurance coverage for the act." *See* Allstate Insurance Company's Memorandum of Points and Authorities in Support of Its Motion for Summary Judgment [hereinafter Allstate Memo.] (dkt. no. 39), at 30, 31. The court has not held that there is coverage for sexual molestation, only that, under the peculiar facts of this case, there is a possibility of coverage for the acts of the juvenile insureds (slim though it may be) and that Allstate therefore has a duty to defend its insureds.

The public policy of Utah is set by the Utah legislature and courts, *see Messersmith v. American Fidelity Co.,* 232 N.Y. 161, 133 N.E. 432, 432 (1921) ("The public policy of this state, when the Legislature acts, is what the Legislature says that it shall be") (per Cardozo, J.), and Allstate has not directed the court to any Utah statute or decision prohibiting coverage in a case such as this. Neither the legislature nor the courts have said that there cannot be insurance coverage for negligent or reckless misconduct of minors, even of a sexual nature.

There is no evidence in this case that the existence of the homeowners policies had anything to do with the acts that allegedly occurred. There is no evidence that the policies were procured in contemplation of the acts or that the policies promoted the acts. *Cf. Eisenman v. Hornberger,* 438 Pa. 46, 264 A.2d 673, 675 (1970). In fact, the homeowners apparently did not know that the acts were going on, and there is no evidence that the juvenile insureds even knew of the policies or of their terms. Denying coverage would not deter any crime, nor do the policies save any insured from the consequences of any crime. *Cf. id.* There is simply "no direct connection" between the policies and the alleged acts and therefore no public policy grounds for not enforcing the terms of the policies. *Cf. id.* (quoting *Blackwell v. National Fire Ins. Co.,* 234 N.C. 559, 67 S.E.2d 750, 750 (1951)).

Allstate is essentially asking the court to "rewrite the policy to provide for a contingency which it could have provided for itself," namely, sexual contacts between minors without any intent to injure. *See id.* Allstate is always free to write its homeowners policies to exclude coverage for all sexual contacts initiated by an insured, but there is neither a need nor authority for this court to read such an exclusion into Allstate's policies on public policy grounds. *Cf. Hardy v. Beneficial Life Ins. Co.,* 787 P.2d 1, 3 (Utah Ct.App.) (insurance companies "are free to incorporate policy exclusions for death from drug overdose," but if they do not elect to do so, "the courts should not write such an exclusion into the policy"), *cert. denied,* 795 P.2d 1138 (Utah 1990).

### B.

### *Coverage for the McLaughlin and Forney Parents*

■ Finally, Allstate argues that there is no coverage for the state-court plaintiffs' claims against the McLaughlin and Forney parents. The claims against the parents are for negligent supervision of their children and negligent failure to warn or otherwise protect the Dietz boys from their children.

Allstate does not dispute that ordinarily the term "accident" is broad enough to cover negligence claims. *Cf. Hoffman,* 669 P.2d at 416 n. 2 (in the area of liability insurance, "courts have generally held that 'accident' includes results negligently caused by the insured"). Allstate argues, however, that it has no duty to defend or indemnify the parents because of the policy's intentional and criminal act exclusions. Allstate cites a long line of cases that have held that, where a policy excludes coverage for bodily injury caused by the intentional or criminal act of "an insured," no coverage exists for *any* in-

sured, including the parents of the intentional tortfeasor. *See* Allstate Memo. at 32–41 and cases cited therein.

Allstate's argument fails for three reasons. First, the court has concluded that the intentional and criminal act exclusions do not preclude coverage in this case for the minor insureds as a matter of law. Because the prerequisite for Allstate's argument—an intentional or criminal act of "an insured"— does not exist as a matter of law, Allstate is not entitled to summary judgment on the issue of coverage for any other insured on that basis.

Second, the intentional act exclusion in the McLaughlin and second Forney policies does not contain the "an insured" language of the policies in the cases Allstate relies on. It only excludes coverage for bodily injury resulting from "[a]n act or omission intended or expected to cause **bodily injury**." While the criminal act exclusion contains the "an insured person" language on which Allstate's argument is based, it does so only in the second subsection, relating to acts that would be criminal if the person had the requisite mental capacity. The juvenile tort-feasors' deposition testimony creates genuine issues of material fact as to whether their acts were intended or expected to cause bodily injury and whether they had the requisite mental state for a crime, precluding summary judgment for Allstate on that basis.

Third, the Tenth Circuit has recently construed policy language identical to the language of the intentional act exclusion in the McLaughlin and second Forney policies and concluded that it did not exclude coverage for negligence claims against a member of the insured tort-feasor's family whose alleged negligence facilitated an intentional tort. *See Allstate Ins. Co. v. Worthington,* 46 F.3d 1005, 1010 (10th Cir.1995).[15] In that case, Allstate had issued a homeowners policy to Mr. and Mrs. Worthington. Mr. Worthington held several people hostage at a hospital and fatally shot a nurse. The victims and survivors sued Mr. and Mrs. Worthington in state court. They claimed Mrs. Worthington had negligently entrusted weapons to her husband and failed to warn the potential victims. Allstate brought a declaratory judgment action against the Worthingtons claiming that it had no duty to defend or indemnify them in the state-court actions. Everyone agreed that there was no coverage for Mr. Worthington's intentional acts. Allstate argued that there was also no coverage for Mrs. Worthington because her negligent acts or omissions did not constitute an "accident" within the meaning of the policy and the policy unambiguously excluded coverage for all insureds where the injuries complained of arose out of the intentional misconduct of any insured. The court rejected both arguments.

With respect to its argument that Mrs. Worthington's alleged negligence was not a covered "accident," Allstate claimed that, in determining whether or not bodily injury arises from an "accident," the court must look at the action that actually caused the injury; if that action was intentional, there is no coverage, even if another insured was only negligent, since the other insured's negligent conduct was not the actual cause of the injury. The court concluded, however, that Utah would "look to the actual allegations of negligence" and not the underlying cause of the injury. *Id.* The allegations against Mrs. McLaughlin and Mr. and Mrs. Forney in the state-court action, like the allegations against Mrs. Worthington, are that they allowed the injury to happen as a result of their negligence. Under *Worthington,* those allegations sufficiently allege an "accident."

■ The court in *Worthington* also concluded that the intentional act exclusion of the policy, which did not explicitly refer to "an insured person," was ambiguous as to whether it was meant to exclude coverage for all insureds based on the intentional act of any one insured, and it construed the ambiguity against the insurer and in favor of coverage. *Id.* at 1007–1010.

For all these reasons, the court concludes that Allstate is not entitled to summary judgment on the issue of its duty to defend Beverlee McLaughlin and Clifford and Lila Forney on the state-court plaintiffs' negli-

---

**15.** The same counsel represented Allstate in *Worthington* as represent Allstate in this action, yet counsel did not notify the court of this controlling precedent.

gent supervision claim. Conversely, because there is at least a possibility of coverage for the adult defendants in the state-court action, Allstate has a duty to defend them in that action. Whether or not Allstate also has a duty to indemnify them for the plaintiffs' negligent supervision claim in the state-court action will depend on the facts the jury finds in the state-court action. Thus, none of the parties is entitled at this time to summary judgment on Allstate's alleged duty to indemnify.

## IV.

### CONCLUSION

The court recognizes, as the defendants do, that "it is difficult to call sexual molestation an accident." Memorandum of the McLaughlin Defendants in Opposition to Allstate's Motion for Summary Judgment (dkt. no. 45), at 4. The court also recognizes that the average homeowner might "cringe" to think that homeowners insurance could cover the sexual perversions of another homeowners' children. See *Wiley v. State Farm Fire & Casualty Co.*, 995 F.2d 457, 464 (3d Cir.1993) (quoting *Rodriguez ex rel. Brennan v. Williams*, 42 Wash.App. 633, 713 P.2d 135, 137–38 aff'd, 107 Wash.2d 381, 729 P.2d 627 (1986)). Let there be no misunderstanding. The court has *not* held that there is insurance coverage for child sexual abuse, nor has it intended to condone the McLaughlin and Forney boys' actions, whatever they may have been. Child sexual abuse is wrong, whether the perpetrator is an adult or another child.[16] The court has only held that, under the disputed facts of this case involving sexual contacts between minors, allegedly without any intent to cause harm, the court cannot say as a matter of law that there is no possibility of coverage under the Allstate policies.

By its decision, the court has not condoned child sexual abuse. Rather, the court has simply tried to construe the terms of the Allstate policies in light of the governing law. That law favors insureds. "As abhorrent and offensive as it is to contemplate that anyone should enjoy the safety net of insurer-sponsored defense ... for alleged sexually aberrant behavior directed against children, courts cannot allow emotion and sympathy to eclipse or unsettle long-standing principles of contractual insurance law." *Allstate Ins. Co. v. Mugavero*, 79 N.Y.2d 153, 581 N.Y.S.2d 142, 149, 589 N.E.2d 365, 372 (1992) (Alexander, J., et al., dissenting).

Allstate is not without a remedy. If Allstate does not wish to cover occurrences such as those that allegedly took place in this case, it is always free to revise its policy to make it clear that it does not cover any damage or injury arising from sexual conduct of an insured—intentionally harmful or not. See *Allstate Ins. Co. v. Jack S*, 709 F.Supp. 963, 967 (D.Nev.1989) ("If Allstate and the insured believed that some acts are so certain to cause injury that an intent to harm should be inferred to the insured, then the exclusion clause should have provided for this expressly"). Indeed, some insurers have tried to so limit the coverage they provide by the express terms of their policies. See, e.g., *Heather F. v. Topa Ins. Co.*, 13 Cal.Rptr.2d 783, 785 (Cal.Ct.App.1992) (day care home liability policy excluded coverage for "bodily injury ... arising out of or as a result of sexual behavior or sexual abuse" and any loss "arising out of licentious, lewd or sexual behavior"); *National Union Fire Ins. Co. v. Lynette C.*, 228 Cal.App.3d 1073, 279 Cal. Rptr. 394, 396 (1991) (foster parents' liability policy excluded coverage for "licentious, immoral, or sexual behavior intended to lead to or culminating in any sexual act").[17]

---

**16.** Allstate suggests that if the court were to deny its motion, it would be sending a message "that sexual molestation of or any intentional harm to children will be tolerated." Allstate Memo. at 31. If anyone reading this opinion were to get such a message, they should read it again. I repeat: Child sexual abuse is wrong, regardless of the identity or intentions of the perpetrator. No one having read this opinion should be able to argue that he is entitled to coverage because he did not know any better.

**17.** The court does not necessarily approve of the wording of the exclusions in those cases. The court in *Heather F.* criticized the exclusion in that case for not stating on whose part the "sexual behavior" must take place for the exclusion to apply: "[C]arried to its logical extreme, such an exclusion would conceivably apply to prevent liability on a policy even where the insured allowed a suspicious stranger to mix with and molest the children under the insured's care," a

The court concludes that there is a possibility that the plaintiffs' claims in the state-court action may be covered under Allstate's policies. Allstate therefore has a duty to defend those claims. Whether or not it also has a duty to indemnify will depend on the jury's findings in the state-court action. Accordingly, Allstate's motion for summary judgment is DENIED. Allstate's motion to strike the Patterson and Dietz defendants' motion for partial summary judgment is also DENIED. The court construes the McLaughlin Defendants' Request for Leave of Court to File a Supplemental Memorandum and Motion for Partial Summary Judgment as seeking leave to join in the Patterson and Dietz defendants' motion for partial summary judgment on the issue of coverage for the allegedly negligent acts of Beverlee McLaughlin, and, to that extent, the motion is GRANTED. The Patterson and Dietz defendants' motion for partial summary judgment is GRANTED to the extent it seeks a declaratory judgment that Allstate has a duty to defend the adult defendants (Beverlee McLaughlin and Clifford and Lila Forney) in the state-court action and is DENIED to the extent it seeks a declaratory judgment that Allstate has a duty to indemnify the adult defendants in the state-court action.

IT IS SO ORDERED.

result the parties arguably did not intend. *See* 13 Cal.Rptr.2d at 791. The court cites these cases only to show that it is within an insurer's ability to expressly exclude coverage for the consequences of an insured's sexual conduct.