**UNITED STATES FIDELITY & GUARANTY COMPANY, Plaintiff and Appellant,**

v.

**Robert SANDT, Linda Sandt, and Sean Sandt, Defendants and Appellees.**

**No. 900601.**

Supreme Court of Utah.

May 28, 1993.

---

Gregory J. Sanders, Salt Lake City, for plaintiff and appellant.

Robert B. Sykes, James D. Vilos, Eugene C. Miller, Salt Lake City, for defendants and appellees.

STEWART, Justice.

United States Fidelity & Guaranty Company (USF & G) appeals from a summary judgment awarding Robert and Linda Sandt $300,000 under their underinsured motorist coverage.

In July 1989, fifteen-year-old Sean Sandt was one of several passengers riding in a pickup truck owned by Pamela Sturgis and driven by Tony Holder. When Holder lost control of the truck, it rolled over, severely injuring Sean. Sean died several months later from his injuries. His medical expenses exceeded $400,000.

The Sturgis vehicle was insured against public liability claims by Farmers Insurance Company (Farmers). Farmers paid the Sandts the policy limit of $100,000. The Sandts then sought to recover $300,000 from their underinsured motorist coverage with USF & G. USF & G refused to pay the $300,000 claim and filed a declaratory judgment action.

USF & G argued to the trial court that the language of the policy excluded Sean Sandt from coverage because he was using the Sturgis vehicle without a "reasonable belief that [he was] entitled to do so." USF & G also asserted that under the terms of the policy, USF & G was entitled to reduce its payment by the amount of the liability insurance that Farmers paid the Sandts. The trial court ruled that Sean was not excluded from coverage and that under the terms of the policy the Sandts were entitled to the full $300,000 of underinsured motorist coverage.

On appeal, USF & G attacks only the trial court's holding that the Sandts were entitled to the full underinsured motorist coverage of $300,000. USF & G asserts that under the language of its underinsured motorist coverage, it is liable for only $200,000 because the $100,000 Farmers paid to the Sandts must be deducted from the $300,000 limit. It relies on a paragraph in the underinsured motorist section entitled "Limit of Liability," which states, "[T]he limit of liability shall be reduced by all sums paid because of the bodily injury by or on behalf of persons or organizations who may be legally responsible." The Sandts rely on a paragraph labeled "Other Insurance" that states, "[A]ny insurance [i.e., underinsured motorist coverage] we provide with respect to a vehicle you do not own shall be *excess over any other collectible insurance.*" (Emphasis added.) We note that if entitled to the full $300,000, the Sandts will not receive a double recovery because their damages exceeded $400,000.

Underinsured motorist coverage provides first-party insurance protection for damages that exceed the limits of the tort-feasor's bodily injury coverage. Underinsured motorist coverage is a facet of uninsured motorist coverage; its purpose is to provide insurance protection to the insured against damages caused by a negligent motorist as if the motorist had another liability policy in the amount of the underinsured policy. *See* 8C John A. Appleman & Jean Appleman, *Insurance Law & Practice* § 5071.45, at 102–03 (1981); *Higgins v. Fireman's Fund Ins. Co.,* 160 Ariz. 20, 770 P.2d 324, 326 (1989).

The extent of USF & G's liability in this case turns on the language of USF & G's policy and the rules of construction that apply to insurance policies. Since 1921 this Court has expressed its commitment to the principle that "insurance policies should be construed liberally in favor of the insured and their beneficiaries so as to promote and not defeat the purposes of insurance." *Richards v. Standard Acc. Ins. Co.,* 58 Utah 622, 200 P. 1017, 1020 (1921); *Colovos v. Home Life Ins. Co.,* 83 Utah 401, 28 P.2d 607, 610 (1934); *see also*

*Browning v. Equitable Life Assur. Soc.,* 94 Utah 570, 80 P.2d 348, 352 (1938) [hereinafter *Browning II* ] ("In construing a policy of life insurance, that interpretation is to be placed upon the words of the policy which is most favorable to the insured."). This fundamental rule is based on the fact that an insurance policy is a classic example of an adhesion contract.

Insurance contracts are typically drafted by insurance company attorneys who are duty-bound to protect the interests of their clients. The terms of a typical insurance policy are not negotiated by the insurer and the insured. A policy is usually offered on a take-it-or-leave-it basis. In 1937, this Court described the one-sided manner in which insurance contracts are drafted:

> Insurance policies, while in the nature of written contracts, are not prepared after negotiations between the parties, to embrace the terms at which the parties have arrived in their negotiations. They are prepared beforehand by the insurer, and the company solicitors then sell the insurance idea to the applicant. Normally, the details and provisions of the policy are not discussed, except that the particular form of policy is best suited to give the applicant the protection he seeks. If he reads the policy he is generally not in a position to understand its details, terms, and meaning except that, in the event against which he seeks insurance, the company will pay the stipulated sums. He seldom sees the policy until it has been issued and is delivered to him. He signs an application blank in which the policy sought is described either by form number or by a general designation, pays his premium, and in due course thereafter receives, either from the agent or through the mails, his policy. Many of its terms and all of its defenses and super-refinements he has never heard of and would not understand them if he read them. Such fact is evident from the fact that cases like this arise where lawyers and courts disagree as to what such provisions mean. In fact, there are about as many different constructions by the courts of terms such as those involved here as there are insurance companies issuing such policies. For this reason the rule of *strictissimi juris has been applied almost universally to insurance contracts, and this jurisdiction, like many others, has declared in favor of a liberal construction in favor of the insured to accomplish the purpose for which the insurance was taken out and for which the premium was paid.*

*Browning v. Equitable Life Assur. Soc.,* 94 Utah 532, 72 P.2d 1060, 1073 (1937) (Larson, J., concurring in part, joined by Folland, C.J., Hanson, J., and Moffat, J.) [hereinafter *Browning I* ] (emphasis added); *see also Gibson v. Equitable Life Assur. Soc.,* 84 Utah 452, 36 P.2d 105, 109 (1934).

Thirty years after *Browning I,* this Court reaffirmed the proposition that insurance policies should be strictly construed against the insurer and in favor of the insured because they are adhesion contracts drafted by the insurance companies. *DiEnes v. Safeco Life Ins. Co.,* 21 Utah 2d 147, 150, 442 P.2d 468, 471 (Utah 1968). In *DiEnes,* the Court quoted the paragraph from *Browning I* set out above and characterized it as "[t]he rule for interpreting an insurance policy." *Id.* at 150, 442 P.2d at 471. In *Whitlock v. Old American Insurance Co.,* 21 Utah 2d 131, 135, 442 P.2d 26, 28 (Utah 1968), the Court reiterated this rule, stating,

> "We have heretofore held that the insured is entitled to the broadest coverage he could reasonably understand from the policy."

(Emphasis added.) See also *P.E. Ashton Co. v. Joyner,* 17 Utah 2d 162, 164, 406 P.2d 306, 308 (Utah 1965), where the Court stated, "[T]he insured is entitled to the broadest protection that he could reasonably believe the commonly understood meaning of its terms afforded him."

It follows that ambiguous or uncertain language in an insurance contract that is fairly susceptible to different interpretations should be construed in favor of coverage. *American Casualty Co. v. Eagle Star Ins. Co.,* 568 P.2d 731, 734 (Utah 1977); *Williams v. First Colony Life Ins.*

*Co.,* 593 P.2d 534, 536 (Utah 1979); *Moore v. Prudential Ins. Co.,* 26 Utah 2d 430, 491 P.2d 227, 229 (1971); *Christensen v. Farmers Ins. Exch.,* 21 Utah 2d 194, 443 P.2d 385, 386 (1968); *DiEnes,* 21 Utah 2d at 150, 442 P.2d at 471; *Joyner,* 17 Utah 2d at 164–65, 406 P.2d at 308; *Jorgensen v. Hartford Fire Ins. Co.,* 13 Utah 2d 303, 373 P.2d 580, 581 (1962). It also follows that if an insurance contract has inconsistent provisions, one which can be construed against coverage and one which can be construed in favor of coverage, the contract should be construed in favor of coverage. *Farm Bureau Mut. Ins. Co. v. Winters,* 248 Kan. 295, 806 P.2d 993, 996 (1991); 43 Am.Jur.2d *Insurance* § 283 (1982).

■ A corollary to these rules is that provisions that limit or exclude coverage should be strictly construed against the insurer. *LDS Hospital v. Capital Life Ins. Co.,* 765 P.2d 857, 858 (Utah 1988); *Browning II,* 94 Utah 570, 80 P.2d 348, 352 (1938); *see also Aetna Casualty & Sur. Co. v. Haas,* 422 S.W.2d 316, 321 (Mo.1968); *Boswell v. Travelers Indem. Co.,* 38 N.J.Super. 599, 120 A.2d 250, 253 (App.Div. 1956); *Harris, Jolliff & Michel, Inc. v. Motorists Mut. Ins. Co.,* 21 Ohio App.2d 81, 255 N.E.2d 302, 305 (1970); *Phil Schroeder, Inc. v. Royal Globe Ins. Co.,* 99 Wash.2d 65, 659 P.2d 509, 511 (1983).

■ Because insurance policies are intended for sale to the public, the language of an insurance contract must be interpreted and construed as an ordinary purchaser of insurance would understand it. *Fuller v. Director of Finance,* 694 P.2d 1045, 1047 (Utah 1985); *Hoffman v. Life Ins. Co. of North Am.,* 669 P.2d 410, 416 (Utah 1983); *Whitlock,* 21 Utah 2d at 135, 442 P.2d at 28 (an insured is entitled to the broadest coverage he could reasonably understand from the policy); *Jorgensen v. Hartford Fire Ins. Co.,* 13 Utah 2d 303, 373 P.2d 580, 581 (1962); *Handley v. Mutual Life Ins. Co. of New York,* 106 Utah 184, 147 P.2d 319, 322 (1944); *Richards v. Standard Acc. Ins. Co.,* 58 Utah 622, 200 P. 1017, 1020 (1920) (insurance terms should be understood in their plain, ordinary, and popular sense).

■ If an ambiguity arises, the rules of construction outlined above must be employed to resolve the ambiguity. An ambiguity in a contract may arise (1) because of vague or ambiguous language in a particular provision or (2) because two or more contract provisions, when read together, give rise to different or inconsistent meanings, even though each provision is clear when read alone. The policy in the instant case contains both types of ambiguity. With respect to both types of ambiguity, the policy must be construed in light of how the average, reasonable purchaser of insurance would understand the language of the policy as a whole. *Camp v. Deseret Mut. Benefit Ass'n,* 589 P.2d 780 (Utah 1979).

■ A reasonable purchaser of insurance could surely read the USF & G policy to provide $300,000 coverage in excess of the public liability insurance coverage. The application for insurance (a request for policy change in this case) stated that the underinsured motorist coverage was "$300,000 each accident." At the beginning of the section on underinsured motorist coverage is a blank for the insertion of a dollar amount for the limit of liability for "each accident." That section's language indicates that the insured has a fixed maximum dollar amount of coverage. The contract states, "We will pay under this coverage only after the limits of liability under any applicable bodily injury liability bonds or policies have been exhausted by payment of judgments or settlements." The contract also unambiguously declares in the first paragraph of the "limit of liability" section, "The limit of liability shown on the schedule [$300,000] here for this coverage is our maximum limit of liability for all damages resulting from any one accident." These provisions clearly support the Sandts' position.

More importantly, the "Other Insurance" clause in the underinsured motorist section specifically addresses the issue at hand, which is the effect Farmers' payment of $100,000 should have, if any, on USF & G's obligation under the contract. That clause states:

If there is other applicable similar insurance, we will pay only our share of the loss. Our share is the proportion that our limit of liability bears to the total of all applicable limits. *However, any insurance we provide with respect to a vehicle you do not own shall be excess over any other collectible insurance.*

(Emphasis added.)

The first and second sentences of this clause make clear that if there is other applicable "similar insurance," USF & G will pay only its "fair share of the loss." "Other applicable similar insurance" in the first two sentences obviously refers to additional underinsured motorist insurance. When there is additional underinsured motorist insurance, the second sentence requires a prorating of the loss among those policies. In this case, the Sandts are not covered by any other underinsured motorist policy.

The third sentence in the "Other Insurance" clause does not refer to "similar insurance" and does not require prorating. Rather, that sentence refers to a situation in which the insured is injured in a vehicle that he does not own, and in that case, *the underinsured motorist insurance is expressly declared to be "excess over any other collectible insurance."* (Emphasis in quotation added.) On its face, the language "excess over any other collectible insurance" includes public liability or bodily injury coverage. That language indicates that USF & G intended to provide underinsured motorist coverage *in excess* of another insurer's bodily injury coverage up to the $300,000 limit.

USF & G asserts the strained argument that the term "any other collectible insurance" in the third sentence means other underinsured motorist insurance. USF & G's construction is not consistent with the plain meaning of the language in the "Other Insurance" clause. The first two sentences of the paragraph refer to other "similar insurance," whereas the third sentence does not. Thus, the phrase "any other collectible insurance" must mean insurance other than additional underinsured motorist insurance. USF & G would have us rewrite the policy language to insert the word "similar" into the "any other collectible insurance" phrase. We decline to do so.

USF & G cites no case law from Utah or any other state that supports its construction of the "Other Insurance" clause. Indeed, it concedes that cases from other jurisdictions are "admittedly not controlling as the cases are highly dependent upon statutes in other states." USF & G cites only to Alan I. Widiss, *Uninsured and Underinsured Motorist Coverage* § 40.1 (2d ed. 1985), in support of its proposition that the "Other Insurance" clause should be construed to mean only other underinsured motorist insurance. Widiss suggests that the "other collectible insurance" language can be construed this way by those with an understanding of the technical and historical developments of uninsured motorist coverage. Widiss also asserts that judges, lawyers, and insurers generally attribute this meaning to the provision, but he does not maintain that this meaning is clear to insureds or to the public at large. Under the rules of construction stated above, the meaning of an insurance provision must be clear to the insureds, and not just to lawyers, judges, and insurers who are familiar with insurance law. Insureds can hardly be held to have knowledge of some obscure historical development in an emerging branch of insurance law.

USF & G also relies on the "Limit of Liability" clause. That clause, however, operates as an exclusion in that it reduces USF & G's liability. Therefore, the clause should be strictly construed. Under Utah law, an insurer must use explicit language if it intends to limit coverage by an exclusion. *See Village Inn Apartments v. State Farm*, 790 P.2d 581, 583 (Utah Ct. App.1990). The "Limit of Liability" clause is less than clear and, when read in con-

junction with the "Other Insurance" clause, is ambiguous. The "Limit of Liability" clause states:

*The limit of liability shown on the schedule [$300,000] here for this coverage is our maximum limit of liability for all damages resulting from any one accident. This is the most we will pay regardless of the number of:*

1. Covered persons;
2. Claims made;
3. Vehicles or premiums shown in the Declarations; or
4. Vehicles involved in the accident.

*However, the limit of liability shall be reduced by all sums paid because of the bodily injury by or on behalf of persons or organizations who may be legally responsible. This includes all sums paid under Part A of this policy.*

Any amounts otherwise payable for damages under this coverage shall be reduced by the sums paid or payable because of the bodily injury under any of the following or similar law:

1. workers compensation law; or
2. disability benefits law.

Any payment under this coverage will reduce any amount that person is entitled to recover under Part A of this policy.

(Emphasis added.)

The first paragraph of this section clearly supports the Sandts' position. The "limit of liability" shown on the schedule is USF & G's "maximum liability." The ordinary purchaser of insurance would understand that USF & G is liable up to the "maximum liability" shown on the schedule. USF & G sidesteps this language and focuses on the next to last paragraph to support its argument that the maximum liability limit here is not $300,000, as stated in the first paragraph, but rather $300,000 less the $100,000 paid by Farmers. Thus, the Farmers public liability limit of $100,000 is used to reduce the USF & G policy limit.

USF & G's construction, though plausible when analyzed by one trained in technical construction, is at best ambiguous when read as an average, reasonable insurance purchaser would. The term "limit of liability" is inherently ambiguous because it has two different meanings under the policy. In the first sentence, the term refers to a fixed and absolute maximum liability. In the next to last paragraph, the term refers to a flexible limit that is determined by deducting the amount paid for bodily injury under a tort-feasor's insurance policy, presumably, the maximum coverage under that policy. The most obvious meaning of the latter language is that USF & G will only pay for damages that exceed what the tort-feasor's insurance paid, up to the maximum stated in USF & G's policy.[1]

USF & G's construction of the policy would permit unconscionable results. The Sandts paid a premium for $300,000 of underinsured motorist coverage. Yet, under USF & G's interpretation, USF & G would never have to pay the full amount of the purchased coverage because, as USF & G admitted at oral argument, a tort-feasor's bodily injury insurance coverage would always be deducted from USF & G's underinsured coverage.

Lastly, USF & G's interpretation of the policy provision would produce wholly unexpected results. The underinsured motorist coverage applies only if the tort-feasor's vehicle is "underinsured." An "underinsured" vehicle is defined as a tort-feasor's vehicle with a bodily injury coverage limit that is less than *the limit of liability* of the underinsured motorist coverage.

Under USF & G's construction, an insured would not be able to collect under the underinsured motorist coverage unless the face value of the policy exceeded twice the amount paid by the tort-feasor's insurance company. For example, if an insured with $40,000 underinsured coverage suffered $40,000 in damages and the tort-feasor had only $20,000 in liability coverage, USF & G's interpretation would deduct the $20,000 payment, thereby limiting its liability to

---

**1.** No one argues that USF & G is liable for the first $100,000 of damages paid under the Farmers policy. However, USF & G seeks to benefit from the Farmers policy a second time by reducing its contractual limit of liability by the amount of the Farmers policy.

$20,000. The insured, however, would collect nothing from USF & G because the insured would not have been injured by an underinsured vehicle inasmuch as the $20,000 policy of the tort-feasor is not less, but the same as, USF & G's $20,000 limit of liability.

The Illinois Supreme Court has dealt with the kind of inequity inherent in USF & G's position. *Glazewski v. Coronet Ins. Co.*, 108 Ill.2d 243, 91 Ill.Dec. 628, 483 N.E.2d 1263 (1985). The underinsured motorist policy in that case contained the same definition and limitation on liability as here. The policy also provided for a reduction of the underinsured coverage. The plaintiffs, purchasers of the insurance, alleged fraud against the insurer for falsely representing that the coverage had value for the purpose of inducing them to purchase the insurance. The court held that to the extent the coverage was valueless, these allegations were sufficient to state a cause of action for fraud. *Id.* 91 Ill.Dec. at 631, 483 N.E.2d at 1266.

We agree with the Illinois court that insurance policies must avoid the potential for misleading consumers. *See Whitlock*, 21 Utah 2d at 135, 442 P.2d at 28. Indeed, the Utah Legislature has prevented this possibility in future underinsured motorist insurance contracts. House Bill 14, effective as of January 1, 1993, requires minimum underinsured motorist coverage in all motor vehicle insurance policies ($10,000 for one person and $20,000 for two or more persons in any one accident, Utah Code Ann. § 31A–22–305(8)(a)) and ties the definition of an underinsured vehicle to the amount of the insured's damages, not to the tort-feasor's coverage limit: " '[U]nderinsured motor vehicle' includes a vehicle ... which has insufficient liability coverage to compensate fully the injured party for all special and general damages." Utah Code Ann. § 31A–22–305(7)(a). In addition, the bill specifically forbids the offsetting of coverage:

Underinsured motorist coverage may not be set off against the liability coverage of the owner or operator of an underinsured vehicle, but shall be added to, combined with, or stacked upon the liability coverage of the owner or operator of the underinsured motor vehicle to determine the limit of coverage available to the injured person.

Utah Code Ann. § 31A–22–305(8)(b) (Supp. 1992). The legislative history of the bill clearly indicates that the Legislature was concerned with the truthfulness of insurance companies' representations to policy holders. Senator Reese stated:

HB 14 also creates a truth in insurance provision when it states that it's illegal to offset or subtract or reduce the amount of your underinsurance coverage by the other person's liability limit. HB 14 states that all underinsurance must be stacked on the underinsured motorist's existing coverage always guaranteeing that the consumer is buying protection through his or her purchase.

Senate Debate of Substitute H.B. 14, 1992 Gen.Sess. (Feb. 21, 1992).

The language of USF & G's underinsured motorist coverage is at best ambiguous and must be construed against USF & G and in favor of the insured. We construe the policy as an average reasonable purchaser of insurance would, that is, to provide a maximum policy coverage of $300,000 in excess of the bodily injury coverage provided by other collectible insurance.

Affirmed.

HALL, C.J., HOWE, Associate C.J., and DURHAM, J., concur.

ZIMMERMAN, Justice (concurring in the result):

I concur in the result reached by the majority on the ground that the contract can reasonably be read as ambiguous and, therefore, the policy terms are to be construed against the drafter. The basis for my conclusion is that an ambiguity exists between the operation of the provision as argued for by the insurer and the stated terms of the contract. This alone is sufficient ground on which to base a finding of ambiguity.

I do not join the majority opinion because I find much of its language to be overbroad and unnecessary to the result reached. There is no need for a shotgun when a rifle will do. *Cf. Peterson v. Browning*, 832 P.2d 1280, 1286 (Utah 1992).