KELLY, J.
(dissenting). I dissent today because the majority has come to what I believe to be the incorrect conclusion on nearly every count. Not only does it reach the wrong result in this case, it takes a drastic step in *492 the wrong direction with respect to contract law in general. The majority’s decision constitutes a serious regression in Michigan law, and it gives new meaning to the term “judicial activism.” Therefore, I cannot let it pass without comment.
It is a legitimate exercise for courts to review the reasonableness of contractual clauses that limit the period during which legal actions can be brought. Courts have conducted reviews of this type for well over a century. These reviews constitute a necessary step in ensuring accurate enforcement of the intent of parties to a contract.
Moreover, in deciding this case, it is unnecessary to reach the issue of adhesion contracts. Yet the majority does so, apparently using this dispute as a vehicle to reshape the law on adhesion contracts more closely to its own desires. I believe that the scrutiny and protections offered by traditional adhesion contract law offer appropriate safeguards for the people of this state. Therefore, I would leave that law unmolested and would affirm the decision of the Court of Appeals.
I. THE LONG HISTORY OF JUDGING LIMITATIONS PERIODS FOR REASONABLENESS
The majority opinion includes an extensive discussion of what its author believes to be the history of the “reasonableness doctrine” in Michigan. It effectively concludes that this Court created new law when it evaluated a shortened limitations period for reasonableness in Herweyer v Clark Hwy Services, 455 Mich 14, 20; 564 NW2d 857 (1997), Armand v Territorial Constr, Inc, 414 Mich 21, 27-28; 322 NW2d 924 (1982), Camelot Excavating Co, Inc v St Paul Fire & Marine Ins Co, 410 Mich 118; 301 NW2d 275 (1981), and Tom Thomas Org, *493 Inc v Reliance Ins Co, 396 Mich 588, 592; 242 NW2d 396 (1976). This is not accurate.
It has long been the law that all limitations periods are subject to judicial review for reasonableness. Statutes of limitations enacted by the Legislature must be subject to such review. “Generally speaking, the time determined by the legislature within which an action may be brought is constitutional where it is reasonable.” 54 CJS, Limitations of Actions, § 5, p 23. (Emphasis added.) This Court recognized and applied this rule more than 140 years ago when it wrote:
[T]he legislative authority is not so entirely unlimited that, under the name of a statute limiting the time within which a party shall resort to his legal remedy, all remedy whatsoever may be taken away.... It is of the essence of a law of limitation that it shall afford a reasonable time within which suit may be brought[,] and a statute that fails to do this cannot possibly be sustained as a law of limitations .... [Price v Hopkin, 13 Mich 318, 324-325 (1865) (citations omitted).]
The essential reasoning behind this rule is that an unreasonable limitations period offers an aggrieved party no recourse to the courts. And it unfairly divests that party of a right that it supposedly provided. 54 CJS, Limitations of Actions, § 5, p 24. ’
For almost 140 years, this same rule and reasoning were applied to limitations periods created both by a contract and by a statute.
[P]arties to a contract may, by an express provision therein, provide another and different period of limitation from the provided statute, and ... such limitation, if reasonable, will be binding and obligatory upon the parties. [1 Wood, Limitation of Actions (4th ed, 1916), § 42, p 145.]
This rule of law was generally accepted and widely cited by courts throughout the country. See Longhurst v Star *494 Ins Co, 19 Iowa 364, 370-371 (1865), Gulf, C & S F R Co v Trawick, 68 Tex 314, 319-320; 4 SW 567 (1887), Gulf C & S F R Co v Gatewood, 79 Tex 89, 94; 14 SW 913 (1890), Sheard v United States Fidelity & Guaranty Co, 58 Wash 29, 33-34; 107 P 1024 (1910), Pacific Mut Life Ins Co v Adams, 27 Okla 496, 503; 112 P 1026 (1910), Fitger Brewing Co v American Bonding Co of Baltimore, 127 Minn 330; 149 NW 539 (1914), Gintjee v Knieling, 35 Cal App 563, 565-566; 170 P 641 (1917), Columbia Security Co v Aetna Accident & Liability Co, 108 Wash 116, 120; 183 P 137 (1919), and Page Co v Fidelity & Deposit Co of Maryland, 205 Iowa 798; 216 NW 957 (1927).
The United States Supreme Court discussed a similar topic well over a century ago. In Express Co v Caldwell,[1] the Court considered a common carrier’s right to enter into a contract to limit its liability.[2] It held that, while a common carrier could enter into such a contract, courts could review the contract provision for reasonableness. This review was deemed essential because carriers were in a position of advantage over members of the public requiring their service. Express Co, supra at 267.
In 1865, the Iowa Supreme Court used similar reasoning when it subjected contractual limitations periods to a reasonableness review. The court was asked to enforce a twelve-month limitations period under circumstances in which the necessary facts to bring a claim could not reasonably have been ascertained in twelve months. It refused, saying that to do so would impute a dishonest purpose to the company. Longhurst, supra at 371.
*495 By putting this construction upon the contract of insurance, you preserve the upright intent of the company intact. Whereas if you put the other construction upon it, you, by implication, charge, or perhaps it would be better to say, judicially determine, that the company granted a policy for a valuable consideration paid, which at the time, they had reason to believe, would be no risk to them and no protection to the insured, and thereby obtained money for themselves under false pretenses. True charity thinketh no evil. It is therefore right for us to presume, that it was the honest intent of the company, to insure the plaintiffs mechanic’s lien upon the premises specified, against loss by fire, and, upon the other hand, that it was the expectation of the insured, in paying the required premium, that his policy would cover the loss and give him the requisite protection. [Id,.]
From these cases, one can see that the reasonableness doctrine is far from a novel legal idea. It has a solid foundation well recognized by the courts of this country, most notably the United States Supreme Court.
Also from these cases, the necessity of having such a review becomes apparent. Courts have recognized that insurers are in a position of power and control over the people purchasing their product. Careful judicial review is imperative so that the power is not abused. Express Co, supra; Longhurst, supra. Moreover, this review is essential in order to accurately implement the intent of the contracting parties. Because the overriding intent of a contract of insurance is to provide protection, the contract should not be read so as to eliminate that protection unreasonably.[3] Id.; Spaulding v Morse, 322 *496 Mass 149, 152-153; 76 NE2d 137 (1947). Otherwise, the insurer would collect money without providing coverage.
Hence, application of the reasonableness rule of contractual construction is well founded and reasoned. And Michigan courts following this rule have wisely joined the general trend of all courts in this country. Rather than creating new law or diverting from established contractual interpretation principles, our Court in Camelot applied a very old and well tested legal rule.[4]
II. MODERN COURTS DISCUSSION OF THE ISSUE AT HAND
The long-established rule that courts review contractual limitations periods for their reasonableness has not been abandoned in modern times. In fact, several state courts have faced the very issue presented in this case. Nearly every court that has considered an uninsured motorist insurance contract that limits the applicable statutory period of limitations has found the limitation unreasonable.
For example, in Elkins v Kentucky Farm Bureau Mut Ins Co [5] the insurance contract limited an uninsured *497 motorist claim to one year following the accident. This conflicted with the two-year statutory period of limitations for claims against a motorist. Id. The Kentucky court found the one-year limitations period unreasonable and refused to enforce it. It stated:
[I]t makes no sense to allow two years (or more) to file a suit against an uninsured or underinsured tort-feasor and yet permit the insurer to escape liability if the suit involving it is not filed within one year. Such would not only be an unreasonably short time, but it would completely frustrate the no-fault insurance scheme. [Id. at 424.]
The Kentucky court noted that it was following the majority of courts that have ruled on the issue. See Scalf v Globe American Cas Co, 442 NE2d 8 (Ind App, 1982); Sandoval v Valdez, 91 NM 705; 580 P2d 131 (1978); Signal Ins Co v Walden, 10 Wash App 350; 517 P2d 611 (1973); Burgo v Illinois Farmers Ins Co, 8 Ill App 3d 259; 290 NE2d 371 (1972); Nixon v Farmers Ins Exch, 56 Wis 2d 1; 201 NW2d 543 (1972).
Therefore, the majority today has not only rejected the long-established rule regarding review for reasonableness, but it has also broken company with the majority of courts addressing the issue. This fact strongly suggests that the majority is not on the firm legal ground it claims. Rather, it is pushing Michigan law out on a tenuous ledge, distancing it from the law of our sister states.
III. THE LIMITATIONS PROVISION UNDER REVIEW WAS UNREASONABLE
Given that the “reasonableness doctrine” has been so well established, it should be applied without hesitation to the facts of this case. A review of the facts demon *498 strates the shocking inequity of the one-year limitations provision in defendant’s uninsured motorist insurances contract.
The section of the contract in question provides:
We will pay compensatory damages which any covered person is legally entitled to recover from the owner or operator of an uninsured motor vehicle because of bodily injury:
1. Sustained by any covered person; and
2. Caused by an accident arising out of the ownership, maintenance or use of an uninsured motor vehicle-,
Claim or suit must be brought within 1 year from the date of the accident. [Emphasis in original.]
This Court in Herweyer articulated the three-pronged test for determining if a limitations clause is reasonable:
It is reasonable if (1) the claimant has sufficient opportunity to investigate and file an action, (2) the time is not so short as to work a practical abrogation of the right of action, and (3) the action is not barred before the loss or damage can be ascertained. [Herweyer, supra at 20, citing Camelot, supra.]
All prongs of the test outlined in Camelot and Herweyer weigh against allowing a shortened limitations period in this case.
Plaintiffs did not have sufficient time to investigate and file an action. Under the contract, the liability for uninsured motorist coverage is triggered only once an uninsured motorist becomes liable for noneconomic loss pursuant to MCL 500.3135(1). Liability for noneconomic loss occurs only if the plaintiffs suffered “death, serious impairment of body function, or permanent serious disfigurement.” MCL 500.3135(1). While death *499 may be ascertainable at the time of the accident, the other two injuries are less readily identifiable.
A party may not know that his injury is permanent until considerable time elapses. During this time, he attends physical therapy and attempts to heal. This may well take longer than a year. Quite often, an injured individual will do everything in his power to escape the label “permanently impaired.” I believe that most individuals are willing to work for a living and will exert considerable effort to recover from an injury in order to return to work. The contractual limitation contained in defendant’s insurance form discourages attempts at recovery. For these reasons, it is unreasonable and should be held to be against public policy.
Also, a party may not learn that he has a serious impairment until after one year has passed. Some injuries, especially soft tissue injuries, are difficult to diagnose. And proper diagnosis and determination of permanency may take a long time. The Legislature seems to have recognized this fact by enacting a three-year statutory period of limitations for bringing suits for noneconomic damages. Given these considerations, the first prong of the Herweyer test weighs against finding this limitation reasonable.
The one-year limitation also works as a practical abrogation of the right created by the insurance agreement. This is the second consideration under the Herweyer test. Herweyer, supra at 20. The best way that a plaintiff can find out if a party is uninsured is to sue him. If an insurance company presents a defense, then the party is insured. However, the time required to reach this point can easily exceed one year.
Under a one-year period of limitations, an insured injured in an automobile accident would be forced to immediately ascertain whether a serious impairment *500 exists. He then would be obliged to file suit against the other motorist well before one year has elapsed. This is because the case might have to progress through at least part of the discovery process for the injured person to determine if the other motorist is uninsured. Then, the insured would have to make a claim with his insurance company. In many instances, all this cannot be accomplished within one year.
The clause providing the one-year limitations period mandates that injured insureds bring suit immediately after their automobile accident. This might be even before they determine if they have a permanent impairment. In effect, the clause requires that baseless lawsuits be filed. Filing such a lawsuit might be the only way a party could claim the uninsured motorist coverage that he paid for. But this early filing still might not move the case along quickly enough to satisfy the one-year limitation.
This is exactly what happened to plaintiffs, Shirley Rory and Ethel Woods. They did not know that the other party to the accident was uninsured until suit had been brought and discovery was underway. They did not delay in the least in making their claim with defendant. They filed well within the limitations period for claims of noneconomic damages. But the majority would still leave them without the uninsured motorist coverage they paid for. Clearly, this is a practical abrogation of plaintiffs’ rights.
That the one-year limitations clause abrogates plaintiffs’ rights becomes even clearer when one contemplates that an insurer for the third party might deny coverage well into the suit. That insurer could determine that its insured should not receive coverage only after defending him for many months. This delayed notice would be outside the control of the injured *501 motorist. But it could deny him the uninsured motorist coverage he paid for from his own insurer. If a third-party insurer waits for a year to deny coverage, the clause would absolutely bar the injured motorist from the benefit of his insurance. The majority simply ignores this inequity.[6]
Also, after one year, the injured party may still be receiving medical treatment. A permanent injury may not yet have been diagnosed. A third-party insurance company could deny coverage at that point. The injured motorist would have done everything in his power to bring suit against the third party. But he would not be able to sustain a claim under his uninsured motorist insurance policy because the third-party insurer did not deny coverage until too late. The contractual limitations clause simply fails to give an adequate period in which to ascertain the loss or damage. Id.
Given that the clause providing a one-year limitations period is found wanting under all three prongs of the Herweyer test, it must be adjudged to be unreasonable. Id. Therefore, the trial court correctly denied summary disposition in this case and the Court of Appeals appropriately affirmed that decision.
IV THE ONE-YEAR LIMITATIONS PERIOD AND MCL 500.2254
The majority concludes that the one-year limitations clause is not contrary to the law or to public policy. But to reach this conclusion, it relies , on a strained reading of MCL 500.2254.1 agree with the Commissioner of the Office of Financial and Insurance Services who filed an amicus curiae brief concluding that MCL 500.2254 forbids a one-year limitations clause.
*502 MCL 500.2254 provides:
Suits at law may be prosecuted and maintained by any member against a domestic insurance corporation for claims which may have accrued if payments are withheld more than 60 days after such claims shall have become due. No article, bylaw, resolution or policy provision adopted by any life, disability, surety, or casualty insurance company doing business in this state prohibiting a member or beneficiary from commencing and maintaining suits at law or in equity against such company shall be valid and no such article, bylaw, provision or resolution shall hereafter be a bar to any suit in any court in this state: Provided, however, That any reasonable remedy for adjudicating claims established by such company or companies shall first be exhausted by the claimant before commencing suit: Provided further, however, That the company shall finally pass upon any claim submitted to it within a period of 6 months from and after final proofs of loss or death shall have been furnished any such company by the claimant. [Emphasis added.]
Under the language of this statute, a policy provision may not prohibit a beneficiary from commencing and maintaining a suit. MCL 500.2254. But this is exactly what the one-year limitations clause does. After expiration of the one-year period, the beneficiary no longer is entitled to maintain a suit for uninsured motorist coverage, even though his claim is allowable by statute for another two years. The limitations clause contravenes the statute. This means it is contrary to Michigan law and Michigan public policy.
In order to support its position, the majority argues that nothing in the statute forbids conditions being placed on the commencement and maintenance of a lawsuit. But such conditions are exactly what the statute speaks of. It forbids a policy provision “prohibiting a member or beneficiary from commencing and maintaining suits[.]” MCL 500.2254. Any “condition” in a *503 policy would be a policy provision. Changing its label does not change what it is. Therefore, any condition prohibiting a beneficiary from commencing and maintaining a suit would equally violate the statute.[7]
In addition, the Legislature explicitly lists two “conditions” that áre exceptions to the general rule in MCL 500.2254. Insurance companies may include in their policy provisions these two “conditions”: (1) the claimant must exhaust any alternative remedies mandated by the policy, such as arbitration, and (2) the claimant must give the insurer six months to decide whether to honor the claim before the claimant may bring suit. MCL 500.2254. The inclusion of these two conditions indicates that the Legislature did not intend to allow any others.
This Court has long relied on the legal maxim expressio unius est exlusio alterius.[8] The maxim is a rule of construction that is a product of logic and common sense. Feld v Robert & Charles Beauty Salon, 435 Mich 352, 362; 459 NW2d 279 (1990), quoting 2A Sands, Sutherland Statutory Construction (4th ed), § 47.24, p 203. In fact, this Court long ago stated that no maxim is more uniformly used to properly construe statutes. Taylor v Michigan Pub Utilities Comm, 217 Mich 400, 403; 186 NW 485 (1922).
If exceptions such as the one-year limitations clause were permissible, it would be pointless for the Legislature to have listed only two exceptions in the statute. It *504 would contravene the well established maxim of expressio unius est exlusio alterius. And it would write into the statute what the Legislature chose to omit. Therefore, I cannot agree with the majority’s interpretation of MCL 500.2254.
V APPROVAL OF INSURANCE FORMS BY THE COMMISSIONER
The majority argues that the Legislature assigned the task of evaluating an insurance provision’s reasonableness to the Commissioner of the Office of Financial and Insurance Services. It relies on MCL 500.2236(5), which provides:
Upon written notice to the insurer, the commissioner may disapprove, withdraw approval or prohibit the issuance, advertising, or delivery of any form to any person in this state if it violates any provisions of this act, or contains inconsistent, ambiguous, or misleading clauses, or contains exceptions and conditions that unreasonably or deceptively affect the risk purported to be assumed in the general coverage of the policy. The notice shall specify the objectionable provisions or conditions and state the reasons for the commissioner’s decision. If the form is legally in use by the insurer in this state, the notice shall give the effective date of the commissioner’s disapproval, which shall not be less than 30 days subsequent to the mailing or delivery of the notice to the insurer. If the form is not legally in use, then disapproval shall be effective immediately. [Emphasis added.]
By using the term “may,” the Legislature has signaled that what follows “may” is a discretionary act. This contrasts with the use of the term “shall,” which signals a mandatory act. Murphy v Michigan Bell Tel Co, 447 Mich 93, 100; 523 NW2d 310 (1994). Nothing in this statute indicates that, in granting this discretion to the commissioner, the Legislature intended to rob the *505 courts of review of the same matter.[9] Moreover, it could be argued that, by not making the commissioner’s review mandatory, the Legislature acknowledged that a court’s exercise of similar review is well-founded and appropriate.
The majority ignores the discretionary nature of the commissioner’s review when it concludes that plaintiffs can challenge the one-year limitations clause only by challenging the approval of the insurance form. But the commissioner is not required to review “conditions that unreasonably or deceptively affect the risk purported to be assumed in the general coverage of the policy.” MCL 500.2236(5).
The majority’s argument amounts to little more than a red herring. It is an attempt to distract from the patent inequity of its ruling today. Because the commissioner’s review is discretionary, reference to MCL 500.2236(5) adds little to this discussion. And it does not justify the majority’s decision to radically change existing law.
VI. ADHESION CONTRACTS
Not content with overturning just one line of precedent used to protect the people of Michigan, the majority goes on to discuss the tangentially related topic of adhesion contracts. It overrules the line of cases offering protection to Michiganians from such contracts and *506 departs from well-established precedent and from the majority of other courts that have addressed the issue. Its decision also defies common sense.
A. THE HISTORY OF ADHESION CONTRACTS AND BALANCING THE INEQUITIES OF THESE CONTRACTS
In discussing the history of adhesion contracts, the majority misses one important point. Before courts applied protections from adhesion contracts, they struggled to deal with the problems presented by form contracts.[10] Although they did not always explicitly state what they were doing, they often acted in a way to balance out the inequities presented by such contracts.
In his early work in the field, Professor Karl N. Llewellyn noted:
[W]e have developed a whole series of semi-covert techniques for somewhat balancing these [form-contract] bargains. A court can “construe” language into patently not meaning what the language is patently trying to say. It can find inconsistencies between clauses and throw out the troublesome one. It can even reject a clause as counter to the whole purpose of the transaction. It can reject enforcement by one side for want of “mutuality,” though allowing enforcement by the weaker side because “consideration” in some other sense is present. [Book review, The standardization of commercial contracts in English and Continental Law, by O. Prausnitz, 52 Harv L R 700, 702 (1939).][11]
*507 Courts have long recognized the inherent problems of form contracts and attempted through various methods to compensate for their inequities. The great legal minds of the early twentieth century began to see the drawbacks of this “semi-covert” action, and they called for uniformity in the field. From this developed the concept and protections of the adhesion contract theory. Meyerson, The reunification of contract law: The objective theory of consumer form contracts, 47 U Miami L R 1263, 1277-1278 (1993).
Despite the majority’s argument, the idea of balancing the inequities of form contracts (or what are now more commonly known as “adhesion contracts”) has been long recognized. And there is good reason for this longstanding recognition. Namely, the bargained-for exchange fundamental to traditional contracts simply does not exist in adhesion contracts.
As the Pennsylvania Supreme Court noted when abandoning the strict construction approach to which the majority regresses today:
The rationale underlying the strict contractual approach reflected in our past decisions is that courts should not presume to interfere with the freedom of private contracts and redraft insurance policy provisions where the intent of the parties is expressed by clear and unambiguous language. We are of the opinion, however, that this argument, based on the view that insurance policies are private contracts in the traditional sense, is no longer persuasive. Such a position fails to recognize the true nature of the relationship between insurance companies and their insureds. An insurance contract is not a negotiated agreement; rather its conditions are by and large dictated by the insurance company to the insured. The only aspect of the contract over which the insured can “bargain” is the monetary amount of coverage. [Brakeman v Potomac Ins Co, 472 Pa 66, 72; 371 A2d 193 (1977).]
*508 The average person does not sit down and bargain for each of the terms in his insurance contract. Quite the opposite is true. He may never read his insurance policies. Most are long and contain nuanced subclauses virtually indecipherable to people not experienced in contractual interpretation or insurance law. This is true despite the increased use of plain English in such policies. In most situations, the individual pays his insurance premiums and then receives the contract in the mail days or weeks later. Most people simply do not have the opportunity, time, or special ability to read the policy before agreeing to it.
And what incentive does the insurance industry have to assure that their insureds read their polices? If people were to read all the language in their insurance contracts, the insurance providers would be flooded with questions and requests to change clauses. It has been observed that “[i]f it is both unreasonable and undesirable to have consumers read these terms, courts should not fashion legal rules in a futile attempt to force consumers to read these terms[.]” Meyerson, supra at 1270-1271.
If the consumer does not read and comprehend the individual clauses of the contract, there can be no agreement on the particular terms in them. There can be no meeting of the minds. Moreover, when one side presents a contract on a take-it-or-leave-it basis and is in a place of considerable power over the other, there can be no bargained-for exchange. Hence, an outdated strict construction policy of construing these agreements is utterly unworkable.[12]
*509 It is for that reason that the majority of the courts in this country has disavowed the strict construction policy in construing contracts of adhesion.[13] Instead, they follow the more equitable and balanced modern trend of viewing adhesion contracts with skepticism. I believe it is a serious mistake for the majority to regress Michigan law away from this well-accepted modern trend that has been created to protect individuals.[14]
*510 The majority contends that it bases its decision on the “freedom of contract and the liberty of each person to order his or her own affairs by agreement.” Ante at 468, 488. It also states that contracts “voluntarily and fairly made” should be enforced. Ante at 468. In making these statements, the majority either ignores or intentionally obfuscates the fact that adhesion contracts are not fairly made or bargained for by individuals managing their own affairs.
Instead, the majority is creating a rule that permits insurance companies to bargain unfairly so that they can maximize their financial profit. The burden of this rule is carried by the average individual who has little, if any, bargaining power when purchasing insurance. The choice made by the majority regresses our judicial system by decades, if not centuries. It places the state back into the era when courts either used covert means of interpreting contracts or ignored equity altogether.
B. THE CONTINUED ATTACK ON INSURANCE CONTRACT PROTECTIONS
Today, the majority continues its attack on the well-developed protections created in insurance law that it started in Wilkie v Auto-Owners Ins Co 469 Mich 41; 664 NW2d 776 (2003). In Wilkie, the majority struck down, erroneously I believe, the doctrine of reasonable expectations. Adding this decision to Wilkie, the majority has now struck down all reasonable means of objectively interpreting insurance contracts. Without objective standards, courts cannot be expected to accurately discern the intent of the parties.
An objective standard produces an essential degree of certainty and predictability about legal rights, as well as a method of achieving equity not only between insurer and insured but also among different insureds whose contribu *511 tions through premiums create the funds that are tapped to pay judgments against insurers. [Keeton, Insurance law rights at variance with policy provisions, 83 Harv L R 961, 968 (1970).]
The abandonment of these important equitable considerations destabilizes the system. The only ones benefited are the insurance companies. Those that are unscrupulous can now more easily create deliberately confusing insurance forms with hidden clauses that change the meaning of the policy. They may thereby collect payments for coverage that is wholly illusory without worry of interference from Michigan courts. I cannot agree with this position. As Justice CAVANAGH once wisely stated:
I object to [the majority’s] attempt to distance itself from the policy choices inherent in its decision today. Simply put, the majority and I differ with regard to the policies that should guide the interpretation of insurance law. I would prefer not to disregard the manner in which the insurance industry operates. Though an adhesion contract may be a necessary ingredient in the trade, I cannot condone a doctrine of interpretation that all but ignores the potentially precarious effect on the bound party. [Wilkie, supra at 70 (CAVANAGH, J., dissenting).]
This Court should not abandon the protections created to right the wrongs of adhesion contracts. I must dissent from its radical change of the law.
VII. CONCLUSION
The reasonableness doctrine is well-established in the law. Judicial review constitutes a necessary step to ensure that the actual intent of parties to a contract is enforced. Therefore, it is inappropriate to overturn the various decisions that support the ability of courts to *512 review for reasonableness the shortening of limitations periods.
In this case, the one-year time limit was so short that it acted as a practical abrogation of the right to bring a lawsuit. Therefore, plaintiffs paid for coverage from which they could never benefit. In such a situation, the only proper action by the Court is to find the limitations period unreasonable.
In deciding this case, it is unnecessary to reach the issue of adhesion contracts. The majority, by venturing into this area of the law and using this case as a vehicle, subjects itself to claims that it engages in judicial activism. The scrutiny and protections offered by traditional adhesion contract law offer a necessary aegis for the people of this state. I see no reason to attack this fundamental tenet of our law.
Therefore, I would affirm the decision of the Court of Appeals.

 88 US (21 Wall) 264; 22 L Ed 556 (1875).

 Under common law, a common carrier would act as an insurer against all loss or damage except that stemming from an act of God or “the public enemy.” Id. at 266.

 The majority argues that the best way to discern the intent of the parties is by using the language contained in the contract. But in truth, the majority’s decision today indicates that this is the only way to discern their intent. I simply disagree, as does the majority of modern courts. As the great Learned Hand stated, “There is no more likely way to misapprehend the meaning of language — be it in a constitution, a statute, *496 a will or a contract — than to read the words literally, forgetting the object which the document as a whole is meant to secure.” Central Hanover Bank & Trust Co v Comm’r of Internal Revenue, 159 F2d 167, 169 (CA 2, 1947). I believe that courts should give effect to the actual intent of the parties as expressed through the document as a whole. The protections contracted for should not be unreasonably eliminated.

 It is true that cases decided before Tom Thomas and Camelot upheld contractual limitations periods without discussing reasonableness. But this does not mean that Michigan courts “eschewed” the principle. Likely, the issue was not raised in those cases. When Michigan courts had the issue actually before them, they followed the well-tested legal rule established by courts throughout the United States legal system, including by the Supreme Court.

 844 SW2d 423 (Ky App, 1992).

 Some would see this ruling as an open invitation for insurance company gamesmanship.

 The majority claims that my interpretation would render invalid a contractual limitations period that paralleled the applicable statutory limitations period. This is not true. In such a situation, the contractual-provision would not limit the commencement and maintenance of a lawsuit, but instead, the statute of limitations would.

 This translates as “the expression of one thing is the exclusion of another.”

 The majority accuses me of reading the review of policy forms as discretionary. That is not my argument. While the commissioner is required to review all forms, the discretionary nature of his disapproval means that his review for reasonableness is also discretionary. The statute would allow the commissioner to let a form enter into use even if he found terms within it to be unreasonable. The statute does not mandate disapproval when a portion of the form is unreasonable. Therefore, the review for reasonableness is discretionary.

 I would note that form contracts came into use only toward the end of the eighteenth century. Meyerson, The reunification of contract law: The objective theory of consumer form contracts, 47 U Miami L R 1263 (1993). Relatively speaking, it was a short time before there was discussion of treating them as contracts of adhesion. During the intervening time, courts found other ways to counterbalance the inequities of these one-sided contracts.

 See also Keeton, Insurance law rights at variance with policy provisions, 83 Harv L R 961, 968-973 (1970).

 The majority contends that consumers should be assumed to know all the contents of their insurance policies. But it notes that without a meeting of the minds no contract exists. The purpose of modern judicial review of adhesion contracts is to balance the inequity that they present. *509 Instead of either forcing a consumer to abide by a term that he never knew of or rejecting the entire contract, the court balances the inequities of the contract to enforce its overriding intent. Therefore, what was fairly bargained for is enforced and what the parties minds truly met on remains. But the majority, instead of continuing to balance these inequities, returns to the generally unworkable strict construction approach. In doing so, it ignores the true nature of adhesion contracts. Brakeman, supra.

 For but a few examples, see Lechmere Tire & Sales Co v Burwick, 360 Mass 718; 277 NE2d 503 (1972), State Farm Mut Automobile Ins Co v Johnson, 320 A2d 345 (Del, 1974), Dairy Farm Leasing Co, Inc v Hartley, 395 A2d 1135 (Me, 1978), Jarvis v Aetna Cas & Surety Co, 633 P2d 1359 (Alas, 1981), State Farm Mut Automobile Ins Co v Khoe, 884 F2d 401 (CA 9,1989), Jones v Bituminous Cas Corp, 821 SW2d 798 (Ky, 1991), Nieves v Intercontinental Life Ins Co, 964 F2d 60 (CA 1, 1992), Broemmer v Abortion Services of Phoenix, Ltd, 173 Ariz 148; 840 P2d 1013 (1992), Grimes v Swaim, 971 F2d 622 (CA 10, 1992), United States Fidelity & Guaranty Co v Sandt, 854 P2d 519 (Utah, 1993), Buraczynski v Eyring, 919 SW2d 314 (Tenn, 1996), Coop Fire Ins Ass’n v White Caps, Inc, 166 Vt 355; 694 A2d 34 (1997), Alcazar v Hayes, 982 SW2d 845 (Tenn, 1998), Andry v New Orleans Saints, 820 So 2d 602 (La App, 2002), Parilla v IAP Worldwide Services VI, Inc, 368 F3d 269 (CA 3, 2004), and Iberia Credit Bureau, Inc v Cingular Wireless LLC, 379 F3d 159 (CA 5, 2004).

 The majority accuses the Herweyer Court of being the true judicial activists. It claims that Herweyer rejected “a century” of precedent. As noted, earlier in this opinion, this truly is not the case. Courts had been balancing the inequities of form contracts nearly since their inception. This Court in Herweyer merely followed that trend. It is only this majority that is reshaping Michigan law and clearly reversing longstanding precedent. In doing so, it is ignoring the current state of contract law and breaking away from the well-established modern trend of adhesion contract interpretation recognized throughout this country.